MAYAGÜEZ SUGAR COMPANY, INC., demandante y apelante, *v.* JUAN CARRERAS, en su carácter de TESORERO INTERINO DE PUERTO RICO, demandado y apelado.

Núm. 8328.—*Sometido:* Diciembre 4, 1941. *Resuelto:* Enero 16, 1942

*Oscar Souffront,* abogado de la apelante; *Hon. Procurador General George A. Malcolm* y *M. Rodríguez Ramos, Procurador General Auxiliar,* abogados del apelado; *Hartzell, Kelley & Hartzell* y *Rafael O. Fernández,* como *amicus curiae.*

El Juez Presidente Señor Del Toro emitió la opinión del tribunal.

La Mayagüez Sugar Company, Inc., una corporación organizada de acuerdo con las leyes de Puerto Rico, pagó bajo protesta $903.39 que el Tesorero de la Isla le cobrara como contribución de un cuarto de centavo por galón de miel sobre 361,355 galones por ella producidos en la zafra de 1938 a 1939 y según ella vendidos a la mercantil de Ponce José Romaguera e Hijos para su exportación.

Hecho el pago en esa forma, entabló demanda contra el Tesorero de la Isla reclamando la devolución de lo pagado, basándose en que la ley no impone la contribución que se le cobrara cuando las mieles se venden como en su caso para la exportación.

El demandado por vía de excepción previa alegó que la demanda no aducía hechos constitutivos de causa de acción.

Oyó la corte a las partes y declaró, por las razones que expuso en su opinión, la excepción con lugar, y estimando que la demanda no era susceptible de enmienda, dictó sentencia desestimándola, con costas. No conforme la demandante interpuso el presente recurso de apelación.

Dos errores señala en su alegato, primero, el que imputa como cometido al resolver que la ley núm. 267 de 1938, pág. 516, impone contribución a las mieles que se fabriquen y vendan en Puerto Rico para fines de exportación y que sean exportadas, y segundo, el que alega que cometió al dictar sentencia sin dar oportunidad a la demandante de enmendar su demanda.

▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆

Las Centrales Aguirre y Machete por sus abogados Hartzell, Kelley & Hartzell, pidieron permiso para comparecer como *amicus curiae* (2 C. J. 1322) y la corte se los concedió. Concurrieron al acto de la vista del recurso en noviembre 12, 1941, y luego, en noviembre 21, archivaron su alegato. Argumentaron en pro de la posición del apelante. En diciembre 4 siguiente el apelado archivó un alegato de réplica al del amicus curiæ y el caso quedó definitivamente sometido.

La cuestión fundamental envuelta consiste en interpretar la sección primera de la ley núm. 267 de 1938, pág. 516, que copiada a la letra dice:

"Sección 1.—Por la presente Ley se impondrá, cobrará y pagará como impuesto de rentas internas por una sola vez la suma de un cuarto (¼) de centavo por cada galón de miel que se fabrique, venda, consuma, se introduzca o de otro modo se disponga para el consumo en Puerto Rico; y tal impuesto será cobrado por el Tesorero de Puerto Rico mediante fijación y cancelación de sellos de rentas internas, que con ese objeto prescribiere; *Disponiéndose, además,* que el expresado impuesto tendrá el carácter de renta interna y debe por lo tanto, ser uniforme y general tanto para el artículo que se produzca y se traiga a Puerto Rico, como para el que se fabrique o se produzca en esta isla, y tal impuesto será cobrado por el Tesorero de Puerto Rico, con sujeción a las disposiciones de la Ley de Rentas Internas, tan pronto como dicho artículo sea fabricado, producido o introducido en Puerto Rico, mediante la fijación y cancelación de sellos de rentas internas en los documentos que al efecto prescribiere el Tesorero Insular."

▆▆▆▆ ¿Se limita la contribución impuesta a las mieles a las que se consuman en Puerto Rico, como alega la apelante, o el consumo en Puerto Rico es una limitación aplicable únicamente a la "disposición" de las mismas "de otro modo" que no sea fabricación, venta, consumo o introducción, como alega el apelado y sostuvo la corte sentenciadora, procediendo entonces la imposición del tributo, irrespectivamente de si la venta lo fué o no para el consumo en la isla o para la exportación?

Responder debidamente esa pregunta será resolver el recurso en justicia.

Resumiendo la jurisprudencia sobre la materia, encontramos en 59 C.J. 985, lo que sigue:

"De acuerdo con la doctrina conocida como 'del último antecedente', las palabras, frases y cláusulas relativas o que modifican deben ser aplicadas a las palabras o frase que inmediatamente las preceden y no deben ser interpretadas en el sentido de extenderse a, o incluir otras más remotas."

Aplicando la regla a este caso, es claro que, decretando como decreta la ley que la contribución se impone "por cada galón de miel que se fabrique, venda, consuma, se introduzca o de otro modo se disponga para el consumo en Puerto Rico," las palabras "para el consumo en Puerto Rico" sólo se aplican a las que inmediatamente le anteceden, o sean "o de otro modo se disponga" y no a las anteriores "fabrique, venda, consuma, se introduzca."

La jurisprudencia, sin embargo, limita la aplicación de la regla. A ese respecto la resume Corpus Juris, así:

"Esta regla es, sin embargo, una mera ayuda para la interpretación y no debe ser observada cuando de un estudio de la ley en su totalidad claramente aparezca que es necesario extenderse hasta un antecedente más remoto. Una ligera indicación de que fué la intención legislativa el extender así el término relativo es suficiente. Cuando varias palabras aparecen seguidas por una cláusula, aplicable tanto a la primera y siguientes palabras como a la última, la cláusula debe interpretarse como de aplicación a todas." 59 C. J. 985, 986.

¿Exige el examen total del estatuto que la restricción "para el consumo en Puerto Rico" se aplique a "fabrique, venda, consuma, se introduzca"? ¿Hay alguna manifestación de la intención legislativa que nos lleve a esa conclusión? ¿La condición es igualmente aplicable a las primeras palabras que a las últimas?

Examinemos la ley en su totalidad para ver si exige que la contribución que impone se limite a mieles consumidas

en Puerto Rico. Por su título y por su exposición de motivos revela que se decretó por considerar la Legislatura que la malaria y la uncinariasis constituían un impedimento a la rehabilitación económica de Puerto Rico que debía combatirse y que no disponiéndose de recursos para ello era necesario imponer la contribución. Siguen sus cinco secciones.

Conocemos la primera. Por la segunda se crea con lo que se recaude el fondo especial llamado ''Fondo para combatir la malaria, la uncinariasis, y para ayudar a las madres insolventes y a los niños abandonados que constituyen un problema social en esta isla.'' Por la tercera, que los fondos serán invertidos por el Comisionado de Sanidad con la aprobación de la Comisión Económica para dar cumplimiento a los fines de la ley. Por la cuarta se deroga toda ley que a ella se oponga o que con ella conflija. Y por la quinta se ordena que empiece a regir desde la fecha de su aprobación por ser de carácter urgente.

Nada se encuentra, pues, en ella que exija la limitación. Al contrario, volviendo a la exposición de motivos de la misma se colige que requiere para su debida ejecución una gran cantidad de dinero, ya que dice: ''De acuerdo con estudios realizados por el Departamento Insular de Sanidad, el 90 por ciento de las personas residentes en distritos rurales en los municipios de la altura están infestadas con el parásito de la uncinaria, y el 40 por ciento de las personas residentes en la costa de la Isla tienen el parásito de la malaria,'' y es sabido que la población de Puerto Rico se acerca a dos millones.

Tampoco revela el examen de la ley que la intención legislativa fuera la de excluir del impuesto las mieles exportadas. Por el contrario, el disponiéndose de la sección primera expresamente decreta que el impuesto ''tendrá el carácter de renta interna y debe por lo tanto, ser uniforme y general tanto para el artículo que se produzca (fuera) y se traiga a Puerto Rico, como para el que se fabrique o se

produzca en esta isla, y tal impuesto será cobrado . . . *tan pronto como dicho artículo sea fabricado, producido o introducido en Puerto Rico . . .*" (Itálicas nuestras.)

Y si se toma en consideración que la propia Legislatura en 1941 (ley núm. 171, pág. 1033) reveló de modo inequívoco su intención en el sentido de gravar todas las mieles, tendrá necesariamente que concluirse que este medio de interpretar no favorece si que perjudica la posición del apelante.

Resta sólo considerar si la condición es igualmente aplicable a las últimas que a las primeras palabras de la ley. Aparte de la redundancia que resultaría de aplicar la condición "para el consumo en Puerto Rico" a "consumo", no hay duda de que lo serían a las otras de que se trata "fabrique, venda, se introduzca." De ahí que debemos detenernos en el estudio del alcance de la excepción.

La única jurisprudencia que cita Corpus Juris para sostener esa parte de su texto es la decisión de la Corte Suprema de los Estados Unidos en el caso de *Porto Rico Ry. Co.* v. *Mor,* 253 U. S. 345, 64 L. Ed. 944. Es como sigue:

"Mor, súbdito del Rey de España, domiciliado en Puerto Rico, instituyó en la Corte de Distrito de los Estados Unidos para Puerto Rico esta acción en ley para recobrar una suma en exceso de $3,000, sin incluir intereses y costas, contra la Porto Rico Railway, Light and Power Company, una corporación de Puerto Rico con oficina principal de negocios allí. La objeción hecha a la jurisdicción de la corte sentenciadora fué desestimada y el demandante obtuvo sentencia. El caso llegó ante la Corte de Circuito de Apelaciones para el Primer Circuito mediante auto de error y esa corte ha presentado ante nuestra consideración, certificada, la cuestión relativa a si la Corte de Distrito tenía jurisdicción. La contestación depende de la interpretación que se le dé a la siguiente disposición, contenida en el artículo 41 de la llamada Acta Jones de marzo 2, 1917, cap. 145, 39 Stat. 951, 965, que provee un gobierno civil para Puerto Rico:

" 'Dicha Corte de Distrito tendrá jurisdicción en todas las causas en que todas las partes litigantes de cualquiera de los lados de la controversia sean ciudadanos o súbditos de un Estado o Estados extranjeros, o ciudadanos de un Estado, Territorio o Distrito de los Estados Unidos no domiciliados en Puerto Rico, y en que la cosa

en litigio, con exclusión de intereses y costas exceda de la suma o valor de $3,000. . .'

''Resulta evidente, bajo esta ley, que si Mor, en vez de ser un súbdito español hubiese sido ciudadano de uno de los Estados Unidos, la corte no habría tenido jurisdicción pues él estaba domiciliado en Puerto Rico. La cuestión fundamental, por tanto, es determinar si la restricción de jurisdicción a casos donde todas las partes litigantes de cualquiera de los lados de la controversia 'no domiciliadas en Puerto Rico' se aplica tanto a extranjeros como a ciudadanos americanos.

''El sistema judicial de Puerto Rico, con anterioridad a la anexión a los Estados Unidos, comprendía una Corte Suprema y cortes de distrito de jurisdicción general y cortes municipales. Los procedimientos en todas estas cortes se tramitaban en español y de acuerdo con los requisitos del derecho civil. Por el artículo 33 de la Ley Foraker, abril 12, 1900, cap. 191, 31 Stat. 77, 84, que estableció lo que se intentaba fuese un gobierno civil provisional para la isla, estas cortes insulares continuaron funcionando, con el disponiéndose que los jueces de la Corte Suprema serían nombrados por el Presidente y los jueces de las cortes inferiores por el Gobernador. Por el artículo 40 del Acta Jones, la jurisdicción de estas cortes y las formas de procedimiento empleadas en ellas fueron respetadas una vez más.

''La 'Corte de Distrito de los Estados Unidos para Puerto Rico,' provista por el artículo 41 del Acta Jones, fué en efecto una continuación de la Corte de Distrito de los Estados Unidos provista por el artículo 34 de la Ley Foraker, según fuere enmendada por la Ley de marzo 2, 1901, cap. 812, artículo 3, 31 Stat. 953. Ambas leyes confirieron a la corte jurisdicción sobre todos los casos que pudieran juzgarse en las cortes de circuito o de distrito de los Estados Unidos; ambos estatutos disponen que la corte procederá en igual forma que esas cortes; y ambos contienen disposición expresa al efecto de que las alegaciones y todos los procedimientos se tramitarán en la lengua inglesa. Pero el Acta Jones restringió la jurisdicción grandemente. La cuantía jurisdiccional, reducida a $1,000 por la ley enmendatoria de marzo 2, 1901, fué subida a $3,000. Y, donde por virtud de la enmienda de 1901 se había conferido jurisdicción a la corte en el caso cuando cualquiera de las partes fuese ciudadano de los Estados Unidos, aun cuando estuviere domiciliado en Puerto Rico, el Acta Jones limitó la jurisdicción que dependía de la ciudadanía americana a los casos donde los americanos no estaban domiciliados en

Puerto Rico. El si limitó igualmente la jurisdicción que dependía en la condición de extranjero (*alienage*) es la cuestión sometida a nosotros.

"No vemos razón alguna para que la cláusula 'no domiciliado en Puerto Rico' no sea interpretada como de aplicación a toda la frase 'ciudadanos o súbditos de un Estado o Estados extranjeros, o ciudadanos de un Estado, Territorio o Distrito de los Estados Unidos'. Cuando varias palabras van seguidas de una cláusula que es aplicable, tanto a la primera y siguientes palabras como a la última, la interpretación correcta del idioma exige que la cláusula sea interpretada como de aplicación a todas. *United States* v. *Standard Brewery*, 251 U. S. 210, 218; *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1, 18–19, y casos allí citados. Además, concurren razones especiales para así interpretar la cláusula en cuestión. El estatuto denota una intención general de limitar grandemente la jurisdicción de la Corte de Distrito. Si la aplicación de la cláusula fuere dudosa, interpretaríamos la disposición de tal manera que se lograra la intención general del Congreso. *American Security & Trust Co.* v. *District of Columbia*, 224 U. S. 491; *Inter-Island Steam Navigation Co.* v. *Ward*, 242 U. S. 1. Pero nos parece claro que se aplica tanto a extranjeros como a ciudadanos americanos.

"La acción puede instituirse en la Corte de Distrito si cualquiera de las partes reúne los requisitos jurisdiccionales; esto es, el estatuto confiere a tal parte no sólo el derecho a demandar, si que también el riesgo de ser demandado. En la población de Puerto Rico figuran muchos extranjeros, españoles en su mayoría. Si la limitación 'no domiciliados en Puerto Rico' no fuera aplicable a los extranjeros el resultado causaría inusitados perjuicios y sin lugar a dudas crearía un discrimen no contemplado por el legislador, contra estos españoles. Un súbdito español domiciliado en Puerto Rico podría ser demandado por un americano domiciliado en Puerto Rico o un puertorriqueño, en la Corte de Distrito, donde los procedimientos se tramitan en la lengua inglesa y en armonía con los requisitos del derecho angloamericano; mientras que un americano domiciliado en Puerto Rico podría ser demandado solamente en las cortes insulares donde los procedimientos se tramitan en la lengua española y de acuerdo con los requisitos y formas del derecho civil. Esto podría no sólo resultar muy inconveniente para los españoles residentes sí que sería inconsistente con el espíritu del artículo XI del Tratado de 1898 entre España y los Estados Unidos (30 Stat. 1754, 1760), bajo el cual se le garantizaba a los españoles que resi-

dían en Puerto Rico 'el derecho a comparecer ante tales cortes y tramitar los procedimientos al igual que los ciudadanos del país al cual pertenecen dichas cortes.'

"No pudo ser la intención del Congreso el conceder jurisdicción a la Corte de Distrito sobre cualquier controversia en la cual un extranjero domiciliado figure como parte y a la vez negarle esa jurisdicción bajo circunstancias similares cuando un americano domiciliado figure como parte.

"A la cuestión sometida a nuestra consideración se resuelve, no ha lugar.''

Hemos insertado íntegra la opinión de la Corte Suprema emitida por el Sr. Juez Brandeis porque de ella no sólo surge y se establece la excepción a la regla gramatical del último antecedente si que la necesidad de su aplicación para dar efecto a la clara intención legislativa. Y esa circunstancia esencialísima no concurre en este caso.

Se insiste por la apelante en que tratándose de la interpretación de un estatuto contributivo, debe serlo en el sentido más favorable al contribuyente, citando el caso de *Gould v. Gould,* 245 U. S. 151, 153, en el que la Corte Suprema de los Estados Unidos resolvió que:

"En la interpretación de estatutos que imponen contribuciones, es la práctica establecida no extender sus disposiciones, por implicación, más allá del claro alcance del lenguaje usado, o ampliar su radio de manera que comprenda materias que no han sido específicamente señaladas. En caso de duda se interpretan estrictamente en contra del Gobierno y a favor del ciudadano. *United States* v. *Wigglesworth,* 2 Story, 369; *American Net & Twine Co.* v. *Worthington,* 141 U. S. 468, 474; *Benziger* v. *United States,* 192 U. S. 38, 55.''

Sin embargo, lo resuelto no quiere decir que cuando en un caso como éste de cobro de contribuciones la regla del último antecedente resulta conforme con la intención legislativa, deje la contribución de cobrarse porque la ley sea susceptible de otra interpretación favorable al contribuyente.

La propia Corte Suprema de los Estados Unidos en el caso de *United States* v. *Stowell,* 133 U. S. 1, en el que la

opinión fué emitida por el Juez Gray, estableció la siguiente doctrina:

"Los estatutos aprobados para evitar fraudes al fisco, aun cuando impongan multas o confiscaciones, no deben interpretarse, como lo son generalmente los estatutos penales, estrictamente en favor del acusado; deben ser interpretados en forma razonable y justa, que lleve a efecto la intención del legislador."

El primero de los errores señalados no fué cometido. Tampoco el segundo.

La corte de distrito resolvió al decidir la excepción todo lo que por la demanda se planteara. Y lo hizo en términos claros dando las razones que tuvo para ello en su opinión. La demandante no le pidió permiso para enmendar su demanda, ni que reconsiderase su sentencia. Apeló y ante la corte de apelación surgió el mismo problema que tuvo ante sí la corte sentenciadora que es el que acabamos de resolver.

En *Vega et al.* v. *Rodríguez et al.*, 17 D.P.R. 251, 253, dijo esta Corte:

"Cuando una corte declara con lugar una excepción previa el caso queda por el momento resuelto, y la parte que gana la excepción tiene derecho a que se dicte una sentencia, a menos que se dé una oportunidad a la otra parte para enmendar o adoptar alguna otra medida. Esa oportunidad puede surgir, según la ley, por permiso o concesión de la corte dado voluntariamente, o a solicitud de la parte vencida, o quizás dicha oportunidad puede surgir de cualquier convenio hecho por las partes."

Y en Bancroft's *Code Pleading,* vol. 1, par. 542, pág. 785, encontramos lo siguiente:

". . . Al declararse con lugar una excepción previa interpuesta contra la demanda en la corte inferior, si el demandante rehusa enmendar su demanda y apela de la sentencia y de la orden declarando la excepción previa con lugar, la corte suprema, si confirma la sentencia, puede no conceder al demandante permiso para enmendar su demanda."

Hemos examinado las enmiendas que se proponen y no nos convencen de que harían cambiar la situación. Decimos

esto, desde luego, sin prejuzgar la resolución final de las mismas. Nuestra decisión de que no debe reabrirse este caso concreto se funda en la impresión que prima facie nos producen dichas cuestiones y a las circunstancias que en el propio caso concurren.

Por virtud de todo lo expuesto *debe declararse sin lugar el recurso y confirmarse la sentencia apelada.*

El Juez Asociado Sr. Snyder no intervino.