Pyramid Products, Inc., demandante y apelada, *v.* Rafael Buscaglia, Tesorero de Puerto Rico, demandado y apelante.

Núm. 8952.—*Sometido:* Diciembre 1, 1944. *Resuelto:* Abril 19, 1945.

*Hon. Procurador General Interino Jesús A. González, Fernando B. Fornaris, Procurador General Auxiliar, y Arcilio Alvarado, Asesor Legal del Tesorero de Puerto Rico, abogados del apelante; Hartzell, Kelley & Hartzell y Rafael O. Fernández, abogados de la apelada; James R. Beverley, R. Castro Fernández y José López Baralt, como amici curiae.*

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

La apelada instituyó este pleito para recobrar la cantidad de $94,188.22 que el Tesorero, basándose en la Ley núm. 217 de 12 de mayo de 1942 ((1) pág. 1151) le cobró por concepto de impuestos, recargos e intereses, y la apelada pagó

bajo protesta, por gasolina importada por ella durante los años 1930, 1931, 1932 y 1933 y enviada a sus almacenes de Santo Domingo para ser allí vendida.

Desde el primero de julio de 1930 hasta el 23 de julio de 1931 rigió en Puerto Rico la Ley núm. 12 de 21 de abril de 1930 (pág. 159), a virtud de la cual se impuso por una sola vez un arbitrio de rentas internas de seis centavos por cada galón de gasolina "que se venda o consuma en Puerto Rico". Esa ley fué derogada por la núm. 40 de 24 de abril de 1931, (pág. 361), que empezó a regir el 24 de julio de 1931 e impuso por una sola vez una contribución de siete centavos por cada galón de gasolina "que se introduzca, fabrique, venda o consuma, o que de otro modo se disponga *para el consumo en Puerto Rico."* (Bastardillas nuestras.) Disponía además la ley que el impuesto tendría el carácter de renta interna, por lo cual debía ser uniforme y general tanto para el artículo que se produjera en el exterior y se trajera a Puerto Rico como para el que se produjera en esta Isla, y que el cobro de ese impuesto debería hacerse "con sujeción a las disposiciones de la Ley de Rentas Internas, tan pronto como la gasolina sea fabricada, producida o introducida en Puerto Rico."

Antes de empezar a regir la citada ley de 1931 el entonces gerente de la apelada inquirió del Tesorero de Puerto Rico cuál sería la norma a seguir por el Departamento de Hacienda en lo que respecta a gasolina introducida después de la vigencia de la Ley núm. 40 y luego exportada. Respondiendo a la consulta, el Tesorero el 23 de julio de 1931 le dirigió una carta exponiendo la práctica que habría de seguir el Departamento en relación con el cobro del impuesto. En consonancia con lo expresado en la referida carta y basándose en la facultad que le confiere la sección 39 de la Ley de Rentas Internas de Puerto Rico, Ley núm. 85 de 20 de agosto de 1925 (pág. 585), según fué enmendada por la Ley núm. 83 de 6 de mayo de 1931 (pág. 505), el 24 de julio de

1931 el Tesorero promulgó un Reglamento de Rentas Internas para regir desde el 4 de agosto de 1931, cuya sección 30 dice así:

"Los artículos que se introduzcan o fabriquen para ser exportados y que fueren exportados dentro de un plazo razonable, estarán exentos del pago de los impuestos si dentro del término de diez días fueren declarados, pero para ello será menester comprobar que han sido fabricados o introducidos para la exportación y que en efecto han sido exportados. Se considerarán como artículos introducidos o fabricados para la exportación todos aquellos cuyo fabricante o importador los tuviere en su poder cuando hiciere el embarque o extendiere la orden o contrato de exportación o documento relacionado con dicha exportación en virtud del cual se pruebe que dicho fabricante o importador ha de exportar dicho artículo y embarcarlo antes de que sea vendido o fuere vendido en Puerto Rico para ser usado o embarcado por otra persona. Pruebas a ese efecto deberán presentarse siempre que lo exija el Tesorero de Puerto Rico."

Al empezar a regir la Ley núm. 40 de 1931 la apelada tenía en existencia 51,300 galones de gasolina introducida bajo la ley anterior, y después de empezar a regir la ley de 1931, en dicho año y en 1932 y 1933 introdujo en Puerto Rico gasolina en diferentes cantidades, sobre la cual, lo mismo que sobre los 51,300 galones que tenía en existencia al empezar a regir la ley de 1931, pagó la contribución de siete centavos por galón. Del total de dicha gasolina, durante los años mencionados exportó para sus establecimientos en Santo Domingo la cantidad de 547,236 galones. La gasolina no era vendida desde Puerto Rico, sino que la operación constituía un simple traslado de existencias de los tanques de la apelada en Puerto Rico a los que tenía en Santo Domingo. Allá era recibida a consignación y vendida por los agentes de la apelada por cuenta de ella, y al fijar el precio de venta en Santo Domingo no se tomaba en consideración el impuesto que previamente había sido pagado en Puerto Rico al introducirse la gasolina en esta Isla, toda vez que dicho impuesto le era devuelto de acuerdo con la sección 30 del Reglamento

del Tesorero tan pronto la apelada acreditaba el hecho de la exportación y demás circunstancias exigidas por el Reglamento. La devolución del impuesto se hacía mediante libramientos firmados y aprobados por el Tesorero, por el Auditor y por el Gobernador de Puerto Rico· Esa práctica administrativa se aplicaba a todas las personas y entidades que introducían gasolina y más tarde la exportaban sin realizar operación alguna en Puerto Rico, y no fué abandonada —según admite el actual Tesorero en su alegato—hasta el mes de febrero de 1942, poco antes de aprobarse la Ley núm. 217 de 1942. Esta Ley, por su sección 2, enmendó la sección 1 de la Ley núm. 40 de 1931, así:

"Por la presente Ley se impone y se cobrará y pagará por una sola vez, como impuesto de Rentas Internas, la suma de siete (7) centavos por cada galón de gasolina que se introduzca, fabrique, venda, traspase, use, consuma, o produzca en Puerto Rico; . . ."

Y por su sección 4 adicionó, entre otras, la siguiente sección a la citada ley de 1931:

"Sección 4a.—Cuando una persona obligada por esta Ley a pagar un arbitrio sobre los artículos manufacturados, producidos, vendidos, traspasadas, usados, consumidos o introducidos en Puerto Rico, no lo hiciere en el tiempo y en la forma establecidos por esta Ley, además de ser culpable de delito menos grave (*misdemeanor*) pagará en adición a dicha contribución y como parte de ella en concepto de penalidad, un cinco (5) por ciento de la cantidad adeudada e intereses a razón del uno (1) por ciento mensual, computables desde la fecha en que debió haberse efectuado el pago conforme a lo dispuesto por esta Ley."

Dispuso además la Ley núm. 217 de 1942 lo siguiente:

"Sección 5.—La contribución impuesta, así como la contribución impuesta y ya cobrada sobre cada galón de gasolina o de cualquier mezcla, solución o combinación que contenga o en la cual se use gasolina, que se hubiera introducido, fabricado, vendido, traspasado, usado, consumido o producido en Puerto Rico . . . desde el primero de julio de 1931, hasta la fecha de la vigencia de la presente Ley, impuestas o impuestas y ya cobradas en virtud de la Ley Núm. 40, aprobada el 24 de abril de 1931, según fué enmendada por la Ley

Núm. 15 del 24 de agosto de 1933 y por la Ley Núm. 68 de 13 de mayo de 1934, quedan y por la presente son reimpuestas, legalizadas, convalidadas y ratificadas y la imposición y la imposición y cobro de dichas contribuciones en virtud de las disposiciones contenidas en las leyes expresadas, así como e incluyendo la imposición y la imposición y cobro de la contribución impuesta por virtud de la presente Ley, sobre cada galón de gasolina, o de cualquier mezcla, solución o combinación que contenga o en la cual se use gasolina, que se hubiera introducido, fabricado, vendido, traspasado, usado, consumido o producido en Puerto Rico . . . desde el primero de julio de 1931, hasta la fecha de la presente Ley, quedan y por la presente son reimpuestas, legalizadas, convalidadas y ratificadas, a los mismos efectos y con igual fuerza, eficacia y vigor como si la presente Ley hubiera estado en vigor desde el primero de julio de 1931, a la cual fecha se retrotraen todos los efectos y disposiciones de la presente Ley sin ninguna limitación.

"Y se ordena al Tesorero de Puerto Rico, proceda inmediatamente al cobro de dichas contribuciones, con sus recargos e intereses si ya no se hubiere efectuado el pago de las mismas o si habiendo sido verificado éste, se hubieren devuelto las cantidades cobradas al deudor o contribuyente por cualquier causa; . . . Disponiéndose, que el Tesorero cumplirá con esta obligación de cobrar y el contribuyente vendrá obligado a pagar dichas contribuciones aún en aquellos casos en que éstas hubieren sido pagadas por el contribuyente y reintegradas por el Tesorero en el período comprendido entre el 1 de julio de 1931 y la fecha de la vigencia de esta Ley.

"Sección 6.—La Sección 4 de la Ley Núm. 170 de 13 de mayo de 1941,[1] queda por la presente derogada; declarándose expresamente

_____

(1)La sección 4 de la Ley núm. 170 de 13 de mayo de 1941 ((1) págs. 1025, 1029) dispone:

"A todos los efectos, la vigencia de esta Ley se retrotrae al 1 de julio de 1931, tal y como si la referida Ley No. 40, aprobada el 24 de abril de 1931 hubiera sido aprobada en esta última fecha en la forma en que por la presente Ley queda enmendada; Disponiéndose, que a partir de la fecha en que comience a regir la presente Ley se cobrarán las respectivas contribuciones de siete (7) centavos y cuatro (4) centavos sobre todo galón de gasolina, 'gas oil' o 'diesel oil' fabricado, vendido, usado o consumido en Puerto Rico, o introducido para su venta, uso o consumo en esta Isla, sobre el cual no se hubiere cobrado la contribución correspondiente; Disponiéndose, además, que no se devolverá contribución alguna cobrada con posterioridad al primero de julio de 1931, por alguno de los conceptos que quedan descritos, cuya devolución se solicite por el fundamento de que la Ley No. 40 de 24 de abril de 1931 no impone contribución por la fabricación, venta, uso, consumo o introducción para la venta, uso o consumo de gasolina, 'gas oil', o 'diesel oil', en Puerto Rico."

que la intención y el propósito de la Legislatura de Puerto Rico al aprobar la Ley Núm. 170 de 13 de mayo de 1941 no fué eximir de imposición o de imposición y cobro de la contribución sobre cada galón de gasolina o de cualquiera mezcla, solución o combinación que contenga o en la cual se use gasolina, o de la contribución sobre cada galón de *gas oil* o *diesel oil* según originalmente se imponía la referida contribución por la mencionada Ley Núm. 40 de 24 de abril de 1931, según quedó enmendada por la Ley Núm. 15 de 24 de agosto de 1933 y por la Ley Núm. 68 de 13 de mayo de 1934, la gasolina o cualquiera mezcla, solución o combinación que contenga o en la cual se use gasolina . . . que se hubiere introducido, fabricado, vendido, traspasado, usado, consumido o producido en Puerto Rico desde el primero de julio de 1931 hasta la fecha de la vigencia de la presente Ley.

"*      *      *      *      *      *      *

"Sección 8.—Todas las disposiciones penales contenidas en las secciones 4*a*, 4*b* y 4*c*[2] que han sido adicionadas por virtud de la presente Ley, solamente serán efectivas prospectivamente, y en ningún caso dichas disposiciones penales se aplicarán retrospectivamente por razón de actos u omisiones incurridos en fecha anterior a la de la vigencia de esta Ley."

Invocando esta ley, el Tesorero exigió a la apelada el pago del impuesto de siete centavos por galón sobre la gasolina exportada por ella a Santo Domingo, ascendiendo la cantidad cobrada a $94,048.39,[3] que se descompone en las siguientes partidas:

Impuesto de siete centavos por galón $41, 943. 30
Recargos _____ 2, 097. 17
Intereses _____ 50, 007. 92

Total_____ $94, 048. 39

La teoría del Tesorero apelante es que de acuerdo con la ley de 1931, una vez que la gasolina ha sido introducida

---

[2] Las secciones 4–*b* y 4–*c* no se transcriben por no ser pertinentes.

[3] La cantidad que reclama la apelada es $94,188.22 debido a que al verificarse el pago bajo protesta se habían acumulado intereses adicionales por la cantidad de $139.83.

en Puerto Rico, recae sobre ella el impuesto de renta interna; que la devolución de los impuestos que por el concepto indicado pagó la apelada durante los años 1931, 1932 y 1933 no estaba autorizada por ley; y que el Tesorero Domenech carecía de facultad para aprobar el reglamento promulgado el mismo día en que empezó a regir la ley de 1931 porque su autoridad para promulgar reglamentos estaba limitada a la Ley de Rentas Internas y no a la Ley creando el impuesto sobre la gasolina aprobada en 1931. Finalmente arguye el Tesorero que la Ley de 1942, al enmendar la ley de 1931 con efecto retroactivo de suerte que se entienda que la ley de 1931 siempre ha sido como quedó enmendada en 1942, no impuso una nueva contribución con efecto retroactivo, sino que reimpuso el arbitrio que había fijado la ley de 1931, que no fué satisfecho por la apelada sobre la gasolina en cuestión toda vez que le fué devuelto por el Tesorero.

■■ La decisión emitida por la Corte Suprema de los Estados Unidos el 12 de noviembre de 1940 en el caso de *West India Oil Co.* v. *Domenech,* 311 U. S. 20, disipó la duda sobre la facultad de la Asamblea Legislativa de Puerto Rico bajo la sección 3 de la Ley Orgánica—según fué enmendada por la Ley Butler en 1927—para imponer arbitrios a los artículos importados de los Estados Unidos o de países extranjeros tan pronto eran introducidos en Puerto Rico. En aquel caso no estaba envuelta la Ley núm. 40 de 1931 que ahora nos ocupa. Se impugnaba allí la autoridad del Tesorero para exigir y cobrar la contribución de dos por ciento (Ley de Rentas Internas, artículo 62, según fué enmendado por la Ley núm. 17 de 3 de junio de 1927, pág. 458) sobre el aceite de combustible que la allí demandante había importado en Puerto Rico y depositaba en tanques de adeudo (*bonded tanks*) bajo el control del Servicio de Aduanas, de los cuales era extraído bajo la supervisión de los agentes federales, para entregarlo a virtud de contratos de venta, a vapores que lo consumían como combustible en sus viajes en

el comercio extranjero. Se resolvió por la Corte Suprema de los Estados Unidos que a virtud de la Enmienda Butler el Congreso autorizó a la Asamblea Legislativa de Puerto Rico a imponer arbitrios sobre artículos importados de los Estados Unidos o de países extranjeros tan pronto son introducidos en Puerto Rico, siempre que no se discrimine entre los artículos importados y los producidos en la Isla; que esa facultad se extendía no sólo a los artículos que se hallaban en el paquete original, si que también a los que no lo estuvieren, y por consiguiente la contribución de dos por ciento sobre la venta en las condiciones descritas era válida.

Pero el hecho de que nuestra Asamblea Legislativa esté autorizada para imponer contribución de rentas internas tan pronto el artículo es introducido en Puerto Rico procedente de los Estados Unidos o de países extranjeros, no implica que al aprobar la Ley núm. 40 de 1931 ejercitara ese poder imponiendo el arbitrio de siete centavos por galón de gasolina tan pronto era introducida independientemente de que fuera para el consumo de Puerto Rico.

La norma (*policy*) de la Asamblea Legislativa en legislación contemporánea con, y anterior y posterior a, la Ley núm. 40 de 1931, fué la de no gravar artículos introducidos de los Estados Unidos o del extranjero, a menos que dichos artículos fuesen introducidos para la venta o consumo en Puerto Rico. Esa práctica cesó, según admite el apelante, en febrero 1942, después de conocerse la decisión del Tribunal Supremo de los Estados Unidos en el caso de *West India Oil Co.* v. *Domenech,* supra, y cuando se hallaba en gestación la Ley núm. 217 de 1942—por la cual se enmendó la Ley núm. 40 de 1931—imponiendo tributo a la gasolina introducida de países extranjeros o de los Estados Unidos, indepedientemente de que dicha gasolina fuese destinada al consumo en Puerto Rico. Así vemos que por la Ley núm· 12 de 1930, a pesar de que hacía tres años había sido aprobada la Enmienda Butler, la Asamblea Legislativa al en-

mendar la sección 2 de la Ley núm. 8 de 11 de mayo de 1927 (pág. 421); dispuso: ''Se impondrá, cobrará y pagará como impuesto de Rentas Internas por una sola vez la suma de seis (6) centavos por cada galón de gasolina *que se venda o consuma en Puerto Rico; . . .*'' (Bastardillas nuestras.)

Y en la sección 38 de la Ley de Rentas Internas, según fué enmendada por la Ley núm. 83 de 6 de mayo de 1931 (págs. 505, 521)—es decir, aprobada doce días después de la Ley núm. 40 de 1931—, al gravar ciertos artículos, prescribió:

''La persona que use o consuma el artículo tributable será responsable del pago del impuesto al introducir o poseer el artículo *para uso o consumo en Puerto Rico*, o al traspasar el mismo a otra persona, sea cual fuere su propósito.'' (Bastardillas nuestras.)

Posteriormente, la Ley núm. 267 de 15 de mayo de 1938 (pág. 516), interpretada en el caso de *Mayagüez Sugar Co.* v. *Carreras, Tes.* (1942), 59 D.P.R. 720, en su sección primera estableció:

''Por la presente Ley se impondrá, cobrará y pagará como impuesto de rentas internas por una sola vez la suma de un cuarto (¼) de centavo por cada galón de miel que se fabrique, venda, consuma, *se introduzca o de otro modo se disponga para el consumo en Puerto Rico; . . .*'' (Bastardillas nuestras.)[4]

Finalmente, en la Ley núm. 171 de 13 de mayo de 1941 ((1) pág. 1033) al enmendar la sección 1 de la Ley núm. 267 de 1938 se usó el lenguaje siguiente:

---

[4] Conviene notar que en el caso de *Mayagüez Sugar Co.* v. *Carreras, Tes.*, supra, lo que estuvo ante la corte fué si la miel que se fabricaba en Puerto Rico sólo estaba sujeta a tributo cuando la fabricación se hacía para el consumo en Puerto Rico. Se resolvió que la frase ''para el consumo en Puerto Rico'' no era aplicable al antecedente ''fabrique,'' porque lo impedía el antecedente ''consuma,'' al cual no podía unirse la frase ''para el consumo en Puerto Rico'' por resultar redundante, teniéndose en cuenta muy especialmente la exposición de motivos de la ley y la circunstancia de que, siendo la miel de caña un producto de exportación, la contribución que se intentó imponer quedaría derrotada si se interpretase que la fabricación sólo era tributable cuando el producto fabricado había de consumirse en Puerto Rico. La cuestión de introducción de artículos procedentes de Estados Unidos o de países extranjeros no estaba envuelta en dicho caso. Se observará, sin embargo, que la Ley núm. 267 de 1938 no ofrece duda alguna de que para que fuera tributable la introducción de las mieles era indispensable que fuera para el consumo en Puerto Rico.

"Se impondrá, cobrará y pagará como impuesto de rentas internas, una contribución de un cuarto ($\frac{1}{4}$) de centavo por cada galón de miel de caña que en cualquier forma se produzca, use, venda o consuma en Puerto Rico, *o se introduzca para su venta, uso o consumo en Puerto Rico.* . . ." (Bastardillas nuestras.)

Queda, pues, demostrada la norma de la Asamblea Legislativa de no gravar aquellos artículos introducidos en Puerto Rico a menos que la introducción fuese para el consumo en la Isla.

La Ley núm. 40 de 1931 impone una contribución de siete centavos "por cada galón de gasolina que se introduzca, fabrique, venda o consuma, o que de otro modo se disponga *para el consumo en Puerto Rico.*" (Bastardillas nuestras.) La frase "que de otro modo se disponga" después de los verbos "introduzca, fabrique, venda o consuma," indica otra forma de disponer del artículo, como por ejemplo, traspasar, usar o donar. Y si la gasolina de que de otro modo se dispone, o sea mediante traspaso, uso o donación, solamente es tributable cuando de ella se dispone en cualquiera de esas formas para el consumo en Puerto Rico, no hay motivo para creer que fué la intención de la Asamblea Legislativa no imponer a la venta, que no es otra cosa que una forma de disponer, la misma condición de que para que sea tributable debe hacerse para el consumo en Puerto Rico. Y si la venta, uso, consumo, traspaso o donación de la gasolina sólo son tributables cuando son para el consumo en Puerto Rico, tenemos que concluir que la intención del legislador no fué gravar la introducción de la gasolina cuando se hace para otros fines que no sea disponer de ella en cualquiera de las formas indicadas "para el consumo en Puerto Rico."

Que la intención legislativa fué que la frase "para el consumo en Puerto Rico" modificara las distintas formas de disponer del artículo, lo demuestra la propia Asamblea Legislativa, la cual, cuando se propuso gravar la mera intro-

ducción de la gasolina,[4a] enmendó por la Ley núm. 217 de 1942 la sección primera de la Ley núm. 40 de 1931, eliminando por completo la frase "o que de otro modo se disponga para el consumo en Puerto Rico," y redactándola así:

"Por la presente Ley se impone y se cobrará y pagará por una sola vez, como impuesto de Rentas Internas, la suma de siete (7) centavos por cada galón de gasolina que se introduzca, fabrique, venda, traspase, use, consuma, o produzca en Puerto Rico; . . ."

El Tesorero, quien por razón de su cargo estaba especialmente informado de las necesidades y conveniencias administrativas, *Estate of Sanford* v. *Comm'r.*, 308 U. S. 39 (1939), al poner en ejecución la ley de 1931 la interpretó, como hemos visto, en el sentido de que la introducción de la gasolina sólo era tributable cuando el artículo era introducido para el consumo, venta o traspaso, o cuando en cualquiera otra forma se disponía del mismo para el consumo en Puerto Rico. Y durante los once años comprendidos entre el 1931, en que empezó la práctica, y el 1942, en que se abandonó, los distintos auditores y gobernadores de Puerto Rico aceptaron esa interpretación como correcta, al firmar en unión del Tesorero los libramientos de pago para el reembolso del arbitrio cobrado al introducir la gasolina que era luego exportada.

Y no fueron sólo los referidos funcionarios los que así interpretaron la ley. El Procurador General Interino Sr. Enrique Campos del Toro, en su opinión de 6 de noviembre de 1939[5] dirigida al Tesorero de Puerto Rico, interpretó de la misma manera aquella parte de la sección 1 de la Ley núm. 40 de 1931 referente al *gas oil* y *diesel oil*—adicionada por la Ley núm. 68 de 1934—que dice así:

---

([4a])Si la Asamblea Legislativa tiene poder para imponer contribución sobre la mera introducción de la gasolina en Puerto Rico, es materia que expresamente dejamos sin resolver por ser innecesario a los efectos de este caso.

([5])Aunque esta opinión no aparece publicada en los tomos de Opiniones del Procurador General de Puerto Rico, tenemos a la vista copia certificada de ella.

". . . Al *Gas Oil* y *Diesel Oil* por la presente se le impone, se le cobrará y pagará por una sola vez una contribución de cuatro (4) centavos por galón *que se introduzca, fabrique, use o consuma o que de otro modo se disponga de ellos para el consumo en Puerto Rico,* cuyo impuesto se impondrá y cobrará en igual forma que se establece anteriormente para la gasolina y sus productos combinados." (Bastardillas nuestras.)[6]

La opinión del Procurador General Interino Sr. Campos del Toro en lo pertinente dice:

"Su consulta envuelve la interpretación del precepto legal transcrito. . . .

"  *   *   *   *   *   *   *

"La letra del estatuto es clara y libre de ambigüedades. De ella resulta que se impondrá una contribución de 4¢ por galón al 'gas oil' y 'diesel oil' que se *introduzca,* fabrique, use, consuma o que de otro modo se dispongan de ellos *para el consumo en Puerto Rico.* Las palabras 'introducir', 'fabricar', 'usar', 'consumir' o 'disponer' están seguidas por la frase 'para el consumo en Puerto Rico'. De modo que la frase 'para el consumo en Puerto Rico', intercalada por el legislador al final de la sentencia y después de las palabras "introducir', fabricar', 'usar', 'consumir' o 'disponer', completan y condicionan el concepto o significado de los cinco verbos que preceden al uso de dicha frase.

"  *   *   *   *   *   *   *

"Consideramos, pues, que la contribución no se impone tan sólo por el hecho de la introducción, sino por la introducción para el consumo en Puerto Rico, resultando de la letra de la misma ley que el legislador exige la concurrencia de los dos requisitos o elementos, a saber, el de la introducción del artículo y que el mismo sea para consumo en Puerto Rico, para que pueda ser tributable.

"  *   *   *   *   *   *   *

"El caso de *West India Oil Co.* v. *Rafael Sancho Bonet,* resuelto en mayo 10 del año en curso [54 D.P.R. 732], se distingue del presente. En dicho caso se trataba de la contribución del dos por ciento sobre ventas y nuestra Corte Suprema resolvió que. si bien el contrato de venta se perfeccionó en Nueva York, dicho contrato se

---

(6)Como podrá verse, la disposición transcrita al imponer la contribución sobre todo galón de *gas oil* o *diesel oil* "que se introduzca, fabrique, use o consuma o que de otro modo se disponga de ellos para el consumo en Puerto Rico," usa un lenguaje sustancialmente igual al de la disposición de la misma sección 1 de la Ley núm. 40 de 1931 relativa a la gasolina.

consumió en Puerto Rico, lugar de la entrega de la mercancía y, por lo tanto debería entenderse, a los efectos de la imposición de la contribución del dos por ciento sobre ventas, que la venta se hizo en el lugar de la entrega; pero en el caso de la American Mineral Spirit Co. [objeto de la consulta] no se trata de una contribución sobre venta, sino de un arbitrio que impone la sección 1 de la Ley Núm. 40 de 1931, según ha sido enmendada, y que ha de pagarse por el contribuyente que introduzca 'gas oil' o 'diesel oil' para consumo en Puerto Rico. Según se desprende de los hechos envueltos en el caso de *West India Oil Co. v. Sancho Bonet*, y el caso que estamos considerando, ambos pueden fácilmente distinguirse.''

Es de conocimiento público que las leyes de rentas generalmente surgen en el Departamento de Hacienda, y las que no se originan allí, antes de ser aprobadas son enviadas al Tesorero para su estudio e informe, de suerte que no hay razón para creer que el Tesorero Domenech, quien ocupó el cargo desde antes de la aprobación de la Ley núm. 40 de 1931 y algún tiempo después de su vigencia, no conociese la intención legislativa.[7] Es significativo también que sus sucesores en el cargo y los distintos gobernadores y auditores tampoco hubiesen estado informados del propósito perseguido por el legislador al aprobar una ley tan importante para el fisco como la que nos ocupa.

Esta corte, en el caso de *De Castro v. Junta Comisionados* (1942), 59 D.P.R. 676, 683, citó entre otros los siguientes párrafos del de *Smith v. Bryan* (Va. 1902), 40 S. E. 652, 654:

''Es una regla de hermenéutica legal que cuando un estatuto es de dudosa interpretación, la corte considerará la que se le hubiere dado cuando empezó a regir, y esa interpretación no variada, bien por la asamblea legislativa o por decisiones judiciales, con el transcurso del tiempo será considerada como la correcta. Suth. *St. Const.* párrafo 307; *Anable v. Com.*, 24 Grat. 563–566; *Lewis v. Whittle*, 77 Va. 415, 422; *Mangus v. McClelland*, 93 Va. 786, 789, 22 S. E. 364.

---

(7)Es digno de notarse que la interpretación que le dió el Tesorero a la Ley núm. 40 no fué algo *a posteriori*, sino que ya se había estudiado desde antes de entrar en vigor la Ley, toda vez que el Reglamento fué aprobado por el Tesorero el mismo día en que entró a regir la Ley. *Norwegian Nitrogen Co. v. U. S.* (1933), 288 U. S. 294, 315.

"Así también, la interpretación que en la práctica se haya dado a un estatuto por los funcionarios públicos y a base de la cual el público en general haya actuado, no solamente debe ser tenida en cuenta, sino que en casos de duda se considerará como decisiva. Se le concede el mismo efecto que a una serie de decisiones judiciales. Se presume que la asamblea legislativa está enterada de dicha interpretación, y cuando ha sido seguida por largo tiempo, en ausencia de legislación contraria que demuestre que debe ser descartada, las cortes la adoptarán."

Y la Corte Suprema de los Estados Unidos en *De Castro* v. *Board of Comm'rs.* (1944), 322 U. S. 451, citó con aprobación el caso de *Smith* v. *Bryan,* supra, y confirmó lo dicho por el Tribunal Supremo de Puerto Rico sobre la influencia que en la interpretación judicial de un estatuto ejerce la que le ha dado el público y las personas por él afectadas.[8]

En el caso de *United States* v. *Alabama Railroad Co.* (1892), 142 U. S. 615, se interpretaba la sección 13 de la Ley del Congreso de 12 de julio de 1876, que decía "que las compañías de ferrocarriles cuyas vías fueron construídas *en todo o en parte* por una concesión de tierra hecha por el Congreso bajo la condición de que el correo sea transportado en sus trenes al precio que el Congreso disponga por ley, recibirán solamente ochenta por ciento de la compensación autorizada por esta ley."[9] (Bastardillas nuestras.)

---

[8] El estatuto interpretado era la Ley núm. 99 de 15 de mayo de 1931 (pág. 627), "Para Establecer un Gobierno Especial para la Capital de Puerto Rico y para otros fines," cuyo artículo 21 dice:

"El Administrador de la Capital será el jefe ejecutivo de la misma, será nombrado por la Junta de Comisionados que se crea por esta Ley y desempeñará su cargo *mientras observe buena conducta.*" (Bastardillas nuestras.)

Se sostuvo por este Tribunal, aplicando la interpretación práctica que le habían dado el electorado, los partidos políticos y el propio De Castro, que el término del cargo era de cuatro años, que era el mismo que tenían los comisionados autorizados para nombrarlo, en vez de "mientras observe buena conducta," como sostenía el apelante.

[9] El texto inglés del estatuto dice:

"That railroad companies whose railroad was constructed in whole or in part by a land grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct, shall receive only eighty per centum of the compensation authorized by this act."

El Administrador General de Correos y los oficiales contadores del Tesoro de los Estados Unidos, en la fecha en que la ley fué aprobada, la interpretaron en el sentido de que la reducción en el precio a que se refiere el estatuto en aquellos casos en que las vías del ferrocarril se extendían sólo en parte sobre terrenos concedidos por el Congreso, solamente debía aplicarse en proporción a la parte del trayecto total construído sobre los terrenos cedidos, y que en cuanto al resto del trayecto debía pagarse la compensación completa. Esta interpretación, que no solamente fué dada por el Administrador General de Correos y los funcionarios antes mencionados, si que también fué aceptada por la apelada Alabama and Chattanooga Railroad Company y sus sucesores, fué seguida desde el año 1876 hasta 1885 por seis administradores generales de correos, hasta que en 1885 el entonces Tesorero revocó la regla de sus predecesores, y no solamente aplicó la tarifa reducida a toda la línea del trayecto, sino que le dió efecto retroactivo a su interpretación, y exigió el reembolso de lo que, según él, la compañía por espacio de nueve años indebidamente había recibido de conformidad con la interpretación anterior. Resolviendo la cuestión, el tribunal se expresó así:

"Somos de opinión que la interpretación contemporánea que el departamento ejecutivo del Gobierno dió al estatuto y que prevaleció por espacio de nueve años durante seis diferentes administraciones de dicho departamento—interpretación que, aunque inconsistente con la letra de la ley, ciertamente armoniza con la equidad del caso—debe considerarse como decisiva en este pleito. Es doctrina bien establecida en esta corte que en caso de ambigüedad, el departamento judicial se inclinará en favor de la interpretación dada al estatuto por el departamento encargado de su ejecución, y si a base de esa interpretación se ha actuado por un número de años, no favorecerá un cambio repentino, por el cual las partes que han contratado con el gobierno confiando en esa interpretación puedan ser perjudicadas. Es especialmente censurable que una interpretación de un estatuto favorable al ciudadano particular sea variada en tal forma que se convierta en retroactiva, y requiera de él el pago de

dinero a que él se creía con derecho a retener y que en esa creencia había hecho su contrato con el gobierno. Estos principios fueron enunciados desde el año 1827 . . . [Citas.]''

Y por último, en el caso de *Estate of Sanford* v. *Comm'r.*, supra, pág. 52, se expone la misma doctrina en los siguientes términos:

''La práctica administrativa puede tener gran peso para determinar la interpretación de un estatuto de significación dudosa cuando esa práctica no está en conflicto con otras disposiciones del estatuto y no es tan inconsistente con las decisiones judiciales aplicables que produzca inconsistencia y confusión en la administración de la ley. Tal elección en la práctica de una de dos posibles interpretaciones de un estatuto por aquellos que son expertos en el campo y se hallan especialmente informados de las necesidades y conveniencias administrativas, tiende a la sabia y justa administración de las leyes. Esto es tanto más así cuando las personas afectadas por la práctica han actuado de acuerdo con ella.''

Al mismo efecto, véanse además las Monografías, *Effect of Practical or Administrative Construction of a Statute on Subsequent Judicial Construction*, 73 L. Ed. 322; *Administrative or Practical Construction of Statute as Precedent for Judicial Construction*, 84 L. Ed. 28.

La propia Asamblea Legislativa, que se presume conocía la interpretación que a la ley habían dado al Tesorero y los demás funcionarios antes mencionados (*Smith* v. *Bryan*, supra; 2 Sutherland, *Statutory Construction*, tercera edición, sec. 5109, pág. 523, y casos citados), la ratificó desde el momento en que al enmendarla en el año 1933 no varió sustancialmente su redacción de forma que la interpretación que le había dado la administración tuviese que ser variada (véase Ley núm. 15 de 24 de agosto de 1933, Primera Sesión Extraordinaria, pág. 81). Fué más lejos aún en el año siguiente cuando por la Ley núm. 68 de 13 de mayo de 1934 (pág. 471), al enmendar de nuevo la sección 1 de la Ley núm. 40 de 1931, separó por una coma la frase ''o que de otro modo se disponga de ella'' de la que le sigue, ''para el con-

sumo en Puerto Rico," de ese modo indicando más claramente su intención de que la frase "para el consumo en Puerto Rico" se aplicase a las distintas formas de disponer.[10] Podríamos aún agregar que las enmiendas introducidas por las Leyes núms. 15 de 1933 y 68 de 1934 tienen un alcance de mayores consecuencias. En una serie de casos el Tribunal Supremo de los Estados Unidos ha sostenido que cuando una ley ha recibido una interpretación administrativa, al reenactarse la ley posteriormente sin variar sustancialmente su redacción, se entiende que la interpretación administrativa ha sido adoptada por el poder legislativo y adquiere fuerza de ley. *Helvering* v. *Reynolds Co.*, 306 U. S. 110, 115 (1939); *Helvering* v. *Winmill*, 305 U. S. 79, 83 (1938); *Hartley* v. *Commissioner*, 295 U. S. 216, 220 (1935); *U. S.* v. *Dakota-Montana Oil Co.*, 288 U. S. 459, 466 (1933); *United States* v. *Cerecedo Hermanos y Compañía*, 209 U. S. 337, 339 (1908); 2 Sutherland, *Statutory Construction*, supra. Al mismo efecto, *Helvering* v. *Griffiths*, 318 U. S. 371, 395 (1943); *Comm'n* v. *Broadcasting System.* 311 U. S. 132, 137 (1940).

◼ Atacando la práctica administrativa, sostiene el apelante que los tesoreros anteriores no tenían facultad para devolver la contribución por ellos cobrada, ni para aprobar el Reglamento que aprobó el Tesorero Domenech el 24 de julio de 1931, en el cual se disponía el procedimiento para el reembolso de los impuestos cobrados sobre gasolina que era luego exportada. La facultad para promulgar el Reglamento en cuestión, si bien no surge expresamente de la Ley núm. 40 de 1931, aparece en la Ley núm. 83 de 1931 antes citada, la cual lo autoriza para promulgar reglamentos en

---

(10)La sección, según fué enmendada por la ley de 1934, en lo pertinente está redactada así:

"En virtud de esta Ley se impone, se cobrará y se pagará por una vez solamente, una contribución de rentas internas en la suma de siete (7) centavos por cada galón de gasolina que se introduzca, fabrique, venda o consuma, o que de otro modo se disponga de ella, para el consumo en Puerto Rico; . . . "

846

relación con la Ley de Rentas Internas. Como la Ley núm. 40 de 1931, en su sección primera, expresamente dispone que el arbitrio impuesto por esa ley tendrá el carácter de renta interna y que "será cobrado por el Tesorero de Puerto Rico, con sujeción a las disposiciones de la Ley de Rentas Internas," preciso es concluir que la facultad para promulgar reglamentos es extensiva a la Ley núm. 40 de 1931.

■ Y en cuanto a la autoridad para devolver dicha contribución, la encontramos en la Ley aprobada el 12 de febrero de 1904 (pág. 167), contenida en las secciones 2365, 2366 y 2367 de los Estatutos Revisados de Puerto Rico, Compilación de 1911, pág. 480. La sección 2365 dice así:

"Siempre que resultare, ya fuere a solicitud hecha por un contribuyente a satisfacción del Tesorero, o bien por investigación practicada por el Tesorero o por el Auditor, al hacer la revisión y corrección de los recibos de contribuciones, que se han cobrado cantidades de dinero por el Tesorero de Puerto Rico indebidamente o en exceso de la cantidad debida, el Auditor queda autorizado, mediante la aprobación del Gobernador, para librar una orden de pago a favor del contribuyente por la cantidad de dicho exceso o por la cantidad que se hubiere pagado indebidamente."

■ Partiendo de la falsa premisa de que la Ley núm. 40 de 1931 impuso tributo a la gasolina introducida en Puerto Rico independientemente de que lo fuera para el consumo en la Isla, sostiene el apelante que la Ley núm. 217 de 1942 no impuso una nueva contribución, sino que reimpuso la que ya existía bajo la Ley núm. 40 de 1931. Como hemos demostrado que la ley de 1931 no impuso contribución alguna a gasolina importada que no habría de ser consumida en esta Isla, la contribución impuesta por la Ley núm. 217 de 1942 a la gasolina "que se introduzca, fabrique, venda, traspase, use, consuma, o produzca en Puerto Rico," es una nueva contribución, y como tal distinta de la de radio más estrecho que imponía la ley de 1931. La Ley núm. 217 de 1942, aprobada después de conocerse la decisión de la Corte Suprema de los Estados Unidos en el caso de *West India Oil Co.* v.

*Domenech,* supra, sí grava· la introducción de gasolina independientemente del uso que luego pueda dársele.[11]

█ Arguye el apelante—como para el caso de que no prospere su contención al efecto de que la Ley núm. 217 de 1942 no impone ninguna otra contribución que no hubiere sido impuesta por la Ley núm. 40 de 1931—que, suponiendo que la primera impusiera la contribución con efecto retroactivo, la retroactividad es válida porque su propósito es subsanar el alegado error del Departamento de Hacienda al interpretar la Ley núm. 40 de 1931 en la forma en que lo hizo.

Los llamados *curative* o *remedial statutes* con efecto retroactivo no son contrarios a la Constitución federal ni a nuestra Ley Orgánica, siempre que el estatuto pueda aplicarse sin producir injusticia. Como dijera el Juez Brandeis en su opinión disidente en el caso de *Untermyer* v. *Anderson* (1928), 276 U. S. 440, 449, "La necesidad de rentas que tiene el gobierno se ha considerado hasta ahora como una justificación suficiente para imponer tributos con efecto retroactivo *siempre que la imposición parezca estar en consonancia con la justicia, y las circunstancias fueren tales que ordinariamente no resultare opresiva."* (Bastardillas nuestras.) Una buena ilustración del principio expuesto la encontramos en el caso de *Graham & Foster* v. *Goodcell,* 282 U. S. 409 (1931), citado por el apelante. En ese caso los contribuyentes habían sido obligados a pagar una contribución que realmente debían, pero su cobro había prescrito por un error de derecho del funcionario encargado de cobrarla. El Congreso pasó una ley a virtud de la cual se impedía a

---

· ([11]) En relación con la norma que hasta el 1942 había seguido la Asamblea Legislativa de Puerto Rico de no imponer tributo sobre gasolina que no sea introducida para la venta o consumo en Puerto Rico, es de notarse que a virtud de la Ley núm. 1 de 22 de junio de 1942 (Segunda Sesión Extraordinaria, pág 3) se eximió de la imposición y cobro de todo arbitrio a productos de petróleo que sean distribuídos desde Puerto Rico para uso fuera de la Isla, hasta noventa días después de terminarse las hostilidades por parte de los Estados Unidos.

los contribuyentes recobrar las cantidades que habían tenido que pagar por concepto de la contribución prescrita. La Corte Suprema de los Estados Unidos sostuvo la validez del estatuto curativo, por estimarlo consistente con el debido procedimiento de ley, por la razón de que su propósito era subsanar el error cometido por el encargado de cobrar la contribución y las circunstancias eran tales que no se cometía ninguna injusticia con los contribuyentes, puesto que como hemos dicho ellos realmente debían la contribución y sólo querían aprovecharse del error del funcionario para librarse de su pago.

*Paramino Co.* v. *Marshall,* 309 U. S. 370 (1940), es otro caso típico de esta clase de legislación. Allí el apelado Clark sufrió una caída el 17 de enero de 1931 mientras trabajaba como estibador para la apelante en aguas navegables de los Estados Unidos. La otra apelante, la Union Insurance Company of Canton, Ltd., era la aseguradora de la Paramino Lumber Co. bajo la Ley de Compensaciones. Habiendo sido Clark incapacitado como consecuencia de la caída, las apelantes voluntariamente le pagaron compensación, y a solicitud de Clark se celebraron audiencias bajo la Ley de Compensaciones. De la prueba resultó que Clark había sido tratado por el médico de su patrono, quien lo operó de la duodécima costilla, e informó que un examen de la undécima demostraba que el sitio de la fractura en esta última había soldado firmemente. A base de esa evidencia, el Comisionado Auxiliar declaró el 26 de agosto de 1931 que Clark había estado totalmente incapacitado a consecuencia de su caída desde la fecha de la misma hasta el 4 de julio de 1931, en cuya fecha había quedado curado, y que le había sido pagada por las apelantes toda la compensación a que tenía derecho. No se estableció procedimiento alguno para revisar esta decisión, la cual fué firme treinta días después de dictada. Pero el dolor de Clark continuó, y cuatro meses después de la orden del Comisionado Auxiliar cerrando el caso, una ra-

diografía tomada por otro médico reveló que la fractura de la undécima costilla no estaba soldada y que para proporcionar alivio a Clark era necesaria una nueva operación para unir los fragmentos de huesos. Después de esta operación la costilla unió, pero en marzo 1935 el médico que practicó la segunda operación informó que Clark todavía sentía dolor en el área de su lesión. Como el Comisionado Auxiliar no tenía jurisdicción sobre el caso después que lo había cerrado y como el término para una revisión judicial había expirado con anterioridad al tiempo de la operación de la undécima costilla, Clark no tenía oportunidad dentro de la ley para obtener el reajuste de su compensación. A base de estos hechos, el Congreso pasó una ley especial (*private act*) en la que se ordenaba a la Comisión de Compensaciones que revisara el caso de Clark y que expidiese una nueva orden, no obstante haber prescrito el término para la revisión de la decisión de acuerdo con las disposiciones de la Ley de Compensaciones. A virtud de la ley especial el caso fué llevado a la corte. Las apelantes atacaron el decreto de la corte inferior alegando que la ley especial violaba la cláusula del debido procedimiento de ley contenida en la Quinta Enmienda de la Constitución federal. El argumento de las apelantes se basaba en que la compensación original era una adjudicación, que ya no podía ser revisada cuando se pasó la ley especial; y que por lo tanto los derechos y obligaciones de las partes habían sido definitivamente determinados y que se les privaba del derecho adquirido a virtud de la decisión del Comisionado Auxiliar, que garantizaba a las apelantes inmunidad contra otras reclamaciones por parte de Clark. Resolviendo la cuestión, dijo la Corte Suprema que la decisión bajo la Ley de Compensaciones de Estibadores y Trabajadores de Puertos determina la responsabilidad del patrono para con el empleado, pero que no podían convenir en que la inmunidad obtenida por el lapso del tiempo para revisar la decisión es el tipo de inmunidad que pro-

tege a sus beneficiados contra legislación retroactiva por la que se autorice revisar la reclamación. La ley especial no dejó sin efecto una sentencia, ni creó un nuevo derecho de acción ni ordenó que se concediese una nueva compensación. La audiencia provista por la ley especial estaba sujeta a las disposiciones de la ley general de compensaciones. No tiene la ley especial el efecto de crear una nueva obligación donde antes ninguna existía. Es una ley para subsanar un defecto en la administración que se ocasionó al resolver la reclamación de compensación. Si la lesión que siempre persistió hubiera sido conocida antes de concederse la compensación, los mismos pagos que se hicieron posteriormente a virtud de la nueva vista concedida por la ley especial le hubieran sido concedidos al obrero como resultado de la primera audiencia. En tales circunstancias, dijo la corte que no veía violación alguna de la cláusula del debido procedimiento de ley. Véanse al mismo efecto también *Illinois Cent. R. Co.* v. *Minnesota*, 309 U. S. 157 (1940) ; *McFaddin* v. *Evans–Snider Fuel Co.*, 185 U. S. 505 (1902) ; *Wheeler* v. *Commissioner of Internal Revenue*, 143 F. (2d) 162, 166 (1944) ; Cooley, *The Law of Taxation* (cuarta edición), vol. 4, sec. 1594, pág. 3152, y vol. 1, sec. 59, pág. 156; Frederick A. Ballard, *Retroactive Federal Taxation*, 48 Harv. L. Rev. 592, 596, 597.

Aún concediendo que la Ley núm. 217 de 1942 sea un estatuto curativo, en el presente caso, si diéramos efecto retroactivo a la enmienda verificada por esa ley, tendríamos que concluir que en cuanto a su retroactividad la ley es inconstitucional porque el cobrar a la apelada la contribución con efecto retroactivo por las transacciones consumadas en los años 1931, 1932 y 1933, la privaría de su propiedad sin el debido procedimiento de ley. Esto es así porque como hemos visto la ley de 1931 no imponía contribución alguna a la gasolina que introducida en Puerto Rico era después exportada, y al amparo de esta ley la apelada exportó la gasolina envuelta en este pleito y al venderla en Santo Do-

mingo no incluyó en el precio el impuesto que había pagado en Puerto Rico y le había sido reembolsado a virtud de la ley entonces en vigor. De suerte que si se le obligase a pagar ese impuesto con efecto retroactivo la apelada no tendría medio alguno de cobrar el impuesto por la gasolina que vendió hace once años y por consiguiente tendría que pagarlo de su propio peculio, lo cual equivaldría a privarla de la cantidad que se le reclama sin el debido procedimiento de ley. *Nichols* v. *Coolidge,* 274 U.S. 531 (1927); *Coolidge* v. *Lang,* 282 U. S. 582 (1931); *P. R. Tobacco Corp.* v. *Buscaglia, Tes.,* 62 D.P.R. 811 (1944). *Cf. Ballester* v. *Tribunal de Apelación,* 61 D.P.R. 474 (1943).

Habiendo llegado a la conclusión de que la Ley núm. 40 de 1931 no impuso contribución alguna sobre la gasolina importada y luego exportada, y que la Ley núm. 217 de 1942 en tanto en cuanto trata de imponer contribución con efecto retroactivo a la gasolina importada por la apelada y exportada por ella durante los años 1931, 1932 y 1933 es inconstitucional, es innecesario considerar las demás cuestiones suscitadas por el apelante.

*Procede por lo expuesto la confirmación de la sentencia apelada.*