THE TEXAS CO. (P. R.) INC., peticionaria *v.* TRIBUNAL DE CONTRIBUCIONES DE PUERTO RICO, demandado; SOL LUIS DESCARTES, TESORERO DE PUERTO RICO, interventor.

Número 262.

*Reasignado*: 11 de diciembre de 1957. *Resuelto*: 2 de marzo de 1961.

*James R. Beverley, R. Rodríguez Lebrón* y *Carmen B. Hernández,* abogados de la peticionaria; *Víctor Gutiérrez Franqui,*

*Procurador General* y *J. B. Fernández Badillo, Procurador General Auxiliar,* abogados del interventor, demandado en el pleito principal.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

The Texas Co. (P. R.) Inc. interpuso el presente recurso para revisar una sentencia del antiguo Tribunal de Contribuciones de Puerto Rico que sostuvo la negativa del entonces Tesorero al reembolso de $5,494.08 por impuestos sobre cierta cantidad de galones de aceite para alumbrado (keroseno) traída por barco a Puerto Rico desde la isleta holandesa de Aruba.

Al tribunal de instancia le fue sometido el caso a base de los hechos acordados en dos estipulaciones de las partes, complementadas por la documentación relativa a la tramitación previa administrativa y una deposición del Sr. Richard B. Polk, y a base de los puntos legales señalados en las alegaciones.

En la primera estipulación, anterior a la querella enmendada, fue textualmente convenido:

"1. Que el día 18 de enero de 1948 arribó al muelle núm. 13 de la ciudad de San Juan el vapor 'Fort Lane' el cual traía un cargamento de kerosene procedente de Aruba.

2. Que la cantidad total de kerosene que traía dicho vapor cuando arribó a Puerto Rico el día 18 de enero de 1948, la cual cantidad estaba consignada a esta Isla, era de 715,943 galones de kerosene a 60°, equivalentes a 723,831 galones a temperatura natural.

3. Que de esa cantidad total de kerosene consignada a Puerto Rico, como cuestión de hecho fueron depositados en los tanques de las compañías gasolineras, 528,460 galones de kerosene a 60°, equivalentes a 534,282 galones a temperatura natural, por la cual cantidad total pagaron al Tesorero las compañías gasolineras The Texas Co., The Shell Co., y The Standard Oil Co. según se comprueba con los recibos de pago de arbitrios, copias fotostáticas de los cuales se acompañan a esta estipulación.

4. Que del cargamento total de kerosene consignado a Puerto

Rico se deduce una merma corriente y ordinariamente habida en todo embarque, la cual merma, por experiencia, se fija en un promedio de .008859303, como promedio de pérdida marítima experimentada en embarques previos, y que en este caso equivale a 6,343 galones de kerosene a 60°, equivalentes a su vez a 6,413 galones a temperatura natural.

5. Que en los momentos en que el vapor 'Fort Lane' bombeaba el kerosene a los tanques de la peticionaria a través de la tubería provista para tal fin resultó una pérdida de 181,140 galones de dicho producto a 60°, equivalentes a 183,136 galones a temperatura natural, cuyo producto se perdió en el mar y en las inmediaciones del muelle núm. 13.

6. Que dicha pérdida de 183,136 galones de kerosene a temperatura natural se debió a negligencia del 'dock foreman', empleado de la querellante, quien, teniendo la responsabilidad de velar por el buen funcionamiento de las líneas o tuberías de recibo de la querellante, dejó parcialmente abierta la válvula de recibo de kerosene de la querellante ubicada en el muelle núm. 13 y quien dejó además sin colocar sobre dicha válvula la pieza circular de acero (blind flange) que cubre la misma como medida adicional de seguridad.

7. Que la pérdida total sufrida por The Texas Co. (P. R.) Inc. y por la cual ésta pagó los arbitrios cuyo reembolso solicita, es de 181,140 galones a 60°, equivalentes a 183,136 galones a temperatura natural."

Y en la segunda estipulación, posterior a dicha querella enmendada:

"1. En los momentos precisos en que ocurrió la pérdida de kerosene a que se refiere la querella de este caso, el señor Angel M. Pacheco Padró, en aquel entonces agente de Rentas Internas y adscrito al Negociado de Arbitrios del Departamento de Hacienda, estaba presente en el sitio en que ocurrió la pérdida y se percató enteramente de la ocurrencia de dicha pérdida y de las causas que la motivaron, aunque en aquel entonces no pudo precisar la cantidad exacta del kerosene que se perdiera.

2. Que las copias que se acompañan a esta estipulación de la carta de 19 de abril de 1948 dirigida por el Honorable Tesorero de Puerto Rico a los abogados de la querellante, así como la copia de la solicitud de reembolso de fecha 9 de abril de 1948 radicada por los abogados de la querellante en las oficinas del

Tesorero de Puerto Rico, son todas copias exactas de los originales de dichos documentos.

3. Que la copia que se acompaña de la Factura de Rentas Internas demostrativa del pago de los arbitrios es una copia-original de dicha factura, no acompañándose copias de la misma a las demás copias de esta estipulación por acuerdo de las partes que aquí estipulan.

4. Las partes incorporan por referencia a esta estipulación los demás documentos que aparecen del legajo de este caso, incluyendo específicamente la deposición del señor Richard B. Polk, así como la anterior estipulación entre las partes de fecha 18 de enero de 1949."

Las cuestiones principales de derecho levantadas ante el tribunal sentenciador fueron:

1. Si El Pueblo de Puerto Rico tenía facultad en ley para imponer y cobrar contribuciones de rentas internas tomando como evento tributable la mera introducción o importación de artículos en la Isla y

2. Si el aceite para alumbrado traído a Puerto Rico por la peticionaria estaba exento de esas contribuciones de conformidad con lo dispuesto en la Ley Núm. 426 de 14 de mayo de 1947.

El Tribunal de Contribuciones dictó sentencia declarando sin lugar la querella enmendada sobre el reintegro de arbitrios. Sus fundamentos se expusieron en una extensa y cuidadosa opinión en la que se llegó a la conclusión de que El Pueblo de Puerto Rico tenía plena autoridad constitucional para imponer y cobrar esos arbitrios en el momento de su introducción o importación en Puerto Rico desde Estados Unidos o desde países extranjeros y sin tomarse en consideración la disposición ulterior del artículo tributado, y en cuanto al punto de la exención contributiva, que la querellante no había agotado previamente la vía administrativa ni concedido oportunidad al Tesorero para resolverla.

Ante nos la peticionaria imputa al tribunal sentenciador la comisión de los siguientes errores:

"A.—El Tribunal de Contribuciones de Puerto Rico erró al resolver que el poder de Puerto Rico para imponer un tributo a

artículos no producidos localmente tan pronto como dichos artículos son importados en la Isla, ya vengan de Estados Unidos o de país extranjero, quedó establecido en marzo 4 de 1927 por la Ley Butler, enmendatoria de la Sección 3 de la Carta Orgánica, en el sentido de hacer la mera importación o introducción un evento tributable. El Congreso de los Estados Unidos no le otorgó este poder a Puerto Rico y no puede nuestra Legislatura imponer un derecho de importación sobre artículos introducidos en Puerto Rico.

B.—El Tribunal de Contribuciones de Puerto Rico erró al resolver que el Congreso de los Estados Unidos en uso de su poder de legislar para los territorios, hizo de la mera importación en Puerto Rico un evento localmente tributable, y al resolver que es una actuación constitucionalmente válida de la Asamblea Legislativa la de imponer un tributo sobre el kerosene introducido en Puerto Rico sin otro evento tributable como por ejemplo el uso o consumo, o disposición del mismo dentro de la Isla.

C.—El Tribunal de Contribuciones de Puerto Rico cometió error al resolver que dicho poder quedó judicialmente consagrado al emitirse la decisión por el Tribunal Supremo de Estados Unidos en el caso de *West India Oil Company* v. *Domenech*, 311 U. S. 20.

D.—El Tribunal de Contribuciones de Puerto Rico cometió error al resolver que hubo una introducción o importación del kerosene objeto de este pleito en Puerto Rico, a los fines del estatuto de Rentas Internas. Asumiendo que en virtud de la Ley Butler se hubiese autorizado a la Legislatura de Puerto Rico a imponer una contribución tan pronto como una mercancía determinada se introduzca en la Isla, es indispensable que se complete el proceso de la introducción de la misma. En el presente caso en el proceso de la entrega, y sin que el producto llegara a tierra, se perdieron cerca de 200,000 galones de kerosene, no habiéndose consumado el evento tributable (taxable event), por lo que no puede gravitar sobre los mismos la carga contributiva que dispone el estatuto.

E.—El Tribunal de Contribuciones de Puerto Rico cometió error al denegar el reintegro de arbitrios solicitado bajo las disposiciones de la Ley 426 aprobada el 14 de mayo de 1947 (Sección 16-C de la Ley de Rentas Internas)."

Discute conjuntamente los tres primeros. Así los resol-veremos.

I

 La peticionaria es una corporación doméstica dedicada desde su organización "a la importación y compraventa de gasolina, kerosene y demás productos de petróleo," según expone en su solicitud. En la noche del 17 al 18 de enero de 1948 trajo a Puerto Rico, a los fines de su negocio, el carga-mento de keroseno sobre el cual pagó los impuestos de rentas internas cuyo reintegro reclamó 82 días después. Para esa fecha el estatuto local sobre rentas internas bajo el cual se impuso y recaudó el arbitrio de tres centavos sobre cada galón de aceite (Ley Núm. 85 de 20 de agosto de 1925), en su parte pertinente disponía:

"*Sección* 16. Artículos sujetos al pago de arbitrios.—Se cobrará y pagará como impuesto de rentas internas, por una sola vez, sobre todos los artículos siguientes y aquéllos comprendidos en esta sección de la ley, que fueren vendidos, traspasados, usados, consumidos o *introducidos* en Puerto Rico:

 1. . . . . . . . .

 2. . . . . . . . .

 29. Aceite para alumbrado (kerosene).—Sobre todo aceite para alumbrado o substituto de éste, que se venda, traspase, use, consuma o *introduzca* en Puerto Rico, un impuesto de tres (3) centavos por galón."

"Sección 37. Traficantes serán responsables del impuesto.— Los traficantes serán responsables del pago del impuesto sobre todos los artículos introducidos por ellos, bien fueran para la venta, traspaso, uso o consumo, *al introducirlos* o al tomar posesión del artículo o artículos en Puerto Rico, o al traspasar los mismos a otro traficante o consumidor, después de haberlos introducido." (Énfasis suplido.)

Con arreglo a esas disposiciones los hechos imponibles (taxable events) entonces eran (y aún, en general, lo son) la venta, el traspaso, uso y consumo y la introducción en Puerto Rico de los artículos enumerados por la ley.

La facultad impositiva sobre la modalidad de la introducción del artículo en Puerto Rico no se tuvo hasta el 4 de marzo de 1927. Al conceder inicialmente el Congreso facultades legislativas a El Pueblo de Puerto Rico para imponer y cobrar impuestos sobre rentas internas por la Sección 3 de la Carta Orgánica de 1917, no se hizo posible la imposición y recaudación del arbitrio tan pronto como el artículo tributado hubiera sido introducido o importado en la Isla. La falta de esta autoridad originó no pocas dificultades prácticas y controversias judiciales. [1]

En 20 de agosto de 1925 nuestra Asamblea Legislativa. aprobó la Ley Núm. 85 "para proveer rentas para El Pueblo de Puerto Rico mediante la imposición de derechos sobre ventas, de derechos sobre fabricación, uso, venta y consumo; de ciertos arbitrios y de licencias sobre determinadas ocupaciones, industrias o negocios." Sería conocida con el nombre de "Ley de Rentas Internas de Puerto Rico." En su Título Segundo, sobre Arbitrios, Primera Parte, integrado por la sección 16, dispuso que se cobrarían y pagarían ciertos impuestos de rentas internas, por una sola vez, sobre determinados artículos enumerados en una larga lista. [2] En general, conforme a su texto original, los hechos imponibles respecto a los artículos gravados eran su venta, traspaso, uso o consumo en Puerto Rico. Pero, considerando la experiencia y dificultades anteriores y consciente la Legislatura de la falta de autoridad específica para imponer y cobrar el tributo en el acto de ser importados esos artículos en Puerto Rico, dispuso por la sección 109 de esa ley:

"Sección 109. A partir de la fecha en que el Congreso de los Estados Unidos ratificare esta sección, se impondrá y co-

---

[1] Sobre este punto: *West India Oil Co.* v. *Gallardo*, 6 F.2d 523. (1925) ; *Porto Rico Tax Appeals*, 16 F.2d 545 (1926) ; Congressional Record, Vol. 67, Part 11, House, July 2, 1926, pág. 12775.

[2] El inciso 29 original se refería a instrumentos musicales; en 1927 fue enmendado para que se refiriese a joyería y, finalmente, por la Ley Núm. 158 del 13 de mayo de 1941, quedó enmendado para tributar el aceite para alumbrado (Keroseno).

brará por el Tesorero de Puerto Rico, sobre todos los artículos enumerados en la sección 16 de esta Ley *que se importasen en Puerto Rico de cualquier estado, territorio o distrito de los Estados Unidos o de países extranjeros,* el mismo impuesto establecido por esta Ley por la fabricación, uso o tráfico de dichos artículos. Dicho impuesto será satisfecho en *el acto de la importación* de dichos artículos y no se entregarán al destinatario o consignatario de los mismos en tanto no acrediten haber satisfecho el impuesto establecido en esta sección. Una vez satisfecho, quedarán exentos los artículos importados de todo impuesto por razón del uso o tráfico de los mismos." (Énfasis suplido.)

Esa expresión legislativa nuestra obtuvo del Congreso franca, rápida y efectiva acogida. El 13 de mayo de 1926 el senador Butler presentó ante el senado federal el proyecto número S-4247 para enmendar varios artículos de nuestra Carta Orgánica de 1917. Poco tiempo después el Comisionado Residente Córdova Dávila presentaba ante la Cámara de Representantes idéntico proyecto con el número HR-12269. Para febrero de 1927 el senador Butler no estaba en el Congreso, pero el senador Willis prohijó el proyecto ante el Senado. Sin oposición alguna y con ligeras enmiendas, quedó finalmente aprobado el 4 de marzo de 1927. Mediante el mismo se adicionó al Artículo 3 de la Carta Orgánica el siguiente párrafo:

"Disponiéndose, además, que las contribuciones de rentas internas que de acuerdo con la facultad concedida por esta ley imponga la Asamblea Legislativa de Puerto Rico, sobre cualesquiera artículos, efectos, mercaderías o mercancías, podrá ser impuesta y cobrada sobre los artículos sujetos a dicha contribución, según determine la referida Asamblea Legislativa, *tan pronto como los mismos hayan sido* fabricados, vendidos, usados o *importados en la Isla;* Disponiéndose, que no se hará distinción alguna entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o manufacturados en Puerto Rico. *Por la presente se ordena a los oficiales de aduanas y del servicio postal de Estados Unidos que ayuden a los debidos funcionarios del Gobierno de Puerto Rico en el cobro de estas contribuciones."* (Énfasis suplido.)

Por la misma ley también se adicionó el siguiente párrafo a su artículo 48:

"No podrá sostenerse en la Corte de Distrito de los Estados Unidos para Puerto Rico pleito alguno con el fin de restringir la tasación o cobro de contribución alguna impuesta por las leyes de Puerto Rico." [3]

Tres meses después de la aprobación de la enmienda Butler nuestra Legislatura, por la Ley Núm. 17 de 3 de junio de 1927, enmendó, entre otras, la sección 16 de la Ley de Rentas Internas del 1925 incluyendo entre los eventos tributables la introducción en Puerto Rico de los artículos gravados. En 6 de mayo de 1931 enmendó su sección 109 para que leyera (como aún lee) así:

"Sección 109. A partir de la fecha en que esta Ley fuera aprobada y *en consonancia con la autoridad concedida por la sección 3 de la Ley Orgánica, según fue enmendada por la Ley del Congreso, aprobada en marzo 4, 1927,* los derechos de rentas internas podrán cobrarse sobre los artículos, efectos, mercade-

---

[3] En el curso de la discusión del proyecto ante la Cámara de Representantes, el congresista Mr. Kiess, en parte, se expresó así:

"Al hacer uso de la autoridad conferídale por la Sección 3 para imponer y cobrar contribuciones de rentas internas, el Gobierno de Puerto Rico ha encontrado que es imposible cobrar dichas contribuciones sobre artículos comprados en los Estados Unidos y enviados por correo a Puerto Rico, o algunas veces cuando dichos artículos eran enviados por barco, toda vez que las cortes han resuelto que las autoridades postales o de aduana no tienen autoridad para retener la entrega de tales artículos sujetos a la contribución de rentas internas hasta que ésta se pague, *ya que tal contribución cobrada en esta forma es en efecto un derecho de aduana.* En otras palabras, las cortes han resuelto que la contribución de rentas internas no puede cobrarse mientras el artículo sujeto a la misma se encuentra en el paquete original.

"Este estado de cosas prácticamente ha anulado *el poder del gobierno insular para imponer contribuciones de rentas internas,* y en su consecuencia la eficacia de esta fuente de ingresos ha sido seriamente menoscabada.

" . . . . . . . .

"*Se espera que el Gobierno de Puerto Rico hará uso de este poder de manera tal que no interponga innecesariamente barrera alguna en el curso de las condiciones de comercio libre que existen hoy día entre* [Puerto Rico] *y el continente, que constituye el principal factor en el progreso y prosperidad de Puerto Rico.*" (Énfasis suplido.)

rías o mercancías sujetos a dicha contribución por esta Ley, *tan pronto como los mismos sean fabricados, vendidos, usados, o introducidos en la Isla;* Disponiéndose, que no se hará distinción alguna entre los productos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos y manufacturados en Puerto Rico." (Énfasis suplido.)

El marcado empeño de la peticionaria en atribuir al impuesto sobre rentas internas en discusión la peculiar naturaleza jurídica de un típico derecho de aduanas carece de consistencia legal. El impuesto de tres centavos por galón de keroseno se estableció como precio a pagarse, por una sola vez, del privilegio de venderlo, usarlo, consumirlo o traficarlo en el mercado insular, y también del privilegio de traerlo o introducirlo aquí sin tomar en consideración su disposición ulterior. El día de su introducción es el día contributivo, la fecha del vencimiento de la obligación contributiva y en que surge la facultad de recaudarlo. Su introducción establece el *nexus* entre los artículos importados y nuestra jurisdicción contributiva confundiéndose con la propiedad del territorio. Un impuesto de aduanas es un impuesto a la importación y exportación de mercancías. [4]

El keroseno lo trajo a Puerto Rico, en el curso ordinario de sus negocios, The Texas Co. (P. R.) Inc., la contribuyente querellante, que es una corporación doméstica constituida y organizada para "la importación y compraventa de gasolina, kerosene y demás productos de petróleo", según antes expusimos. Nunca esa traficante en petróleo y sus derivados alegó, ni intentó alegar, que el keroseno que trajo aquí en el

---

[4] Para mayor claridad en cuanto a la naturaleza de ambos impuestos, el de rentas internas y el de aduanas, hacemos referencia a las leyes de rentas internas estructuradas por la legislación federal. En éstas, cuando se aplican a artículos importados, la imposición y recaudación se implementan en la práctica conjuntamente con las leyes de aduanas sin que por ello se pierda la naturaleza peculiar de cada impuesto. Conforme a las disposiciones de la Ley de Rentas federal, 1954 (Título 26 U.S.C.A.), el impuesto de rentas internas se impone *en adición a cualquier derecho de aduanas, a que puedan estar sujetos los distintos productos que se tributan.* Véanse sus secciones 2306, 2356, 3422–3425, 3490, 3501.

"Fort Lane" no vino destinado para su venta, uso o consumo. Aun en el caso de que su venta no hubiera sido su suerte, la sección 7 de la Ley Núm. 85, en su segunda oración, lo consideraba introducido en el país "para ser usado o consumido por el adquirente." (5)

Ni del título de nuestra ley sobre rentas internas, ni de su texto se desprende que Puerto Rico, territorio sin aduanas o servicios aduaneros propios, configurara un típico impuesto de aduanas sobre el keroseno ni sobre ningún otro artículo. Tan es así que hasta el 3 de junio de 1927 en que se enmendó por primera vez su sección 16, o sea, después de unos tres meses de la aprobación de la enmienda Butler, no figuraban ni en su título ni en su texto los términos "introducción", o "importación".

Con gran acierto se expresó el tribunal sentenciador al considerar este extremo de la controversia:

"El efecto práctico que tal contribución pueda tener como un derecho de aduana o la caracterización de un 'impuesto de aduana', no cobrado por funcionarios aduaneros, que los comentaristas del derecho puedan darle a la contribución, es algo que entendemos no nos debe preocupar si por otra parte la Asamblea Legislativa tiene facultad constitucional para imponer la contribución al artículo tan pronto como es importado en la isla y el mismo se encuentra dentro de la jurisdicción de Puerto Rico.

"Igualmente, el debate constitucional en cuanto a si la *mera* introducción o importación puede hacerse o no el evento tribu-

---

(5) Esa sección 7 "impide cualquier artimaña legal por la cual, bajo cualquier teoría ingeniosa de que los artículos no se trajeron ni para la venta ni para el uso, se evita el arbitrio." *P. R. Ilustrado* v. *Buscaglia*, 64 D.P.R. 914, 954 (1945).

La razón que expuso la peticionaria para el pago bajo protesta que hizo el 10 de febrero de 1948 fue: "Protest is made on grounds that kerosene involved was lost before landing and never entered Puerto Rico." El único fundamento que expusieron sus abogados en la Solicitud de Reintegro que el 9 de abril siguiente presentaron al entonces Tesorero de Puerto Rico es el siguiente: "5.—Entiende la peticionaria que habiéndose perdido el artículo tributable antes de ser introducido en Puerto Rico y no habiendo sido el mismo nunca vendido, traspasado, usado o consumido en esta Isla, tiene derecho a que le sean reembolsados los arbitrios por tal concepto."

table resulta punto menos que académico y sería crear, de una sutileza, un argumento legal.

"En este caso, el Inciso 29 de la Sección 16 de la Ley de Rentas Internas imponía un arbitrio de 3 centavos por galón sobre el kerosene o sustituto de éste 'que se venda, traspase, use, consuma, *o introduzca en Puerto Rico.'* El estatuto pudo haber usado la forma de expresión de la propia Ley Butler 'tan pronto como haya sido importado en la Isla', en vez de 'o introduzca', o pudo haber dicho 'al ocurrir su introducción', o 'a su introducción', o cualquier otra forma de expresión parecida. A los efectos prácticos todas significarían lo mismo, pues si Puerto Rico puede imponer una contribución *tan pronto como* el artículo es importado, sin esperar nada más, la importación o introducción es el acto generador del tributo, y por ende, el evento tributable. Y es que a pesar de las dudas y temores en cuanto a las implicaciones y el impacto de este poder de Puerto Rico en el sistema constitucional de Estados Unidos, lo cierto es que no es ni ha sido nuestra Asamblea Legislativa la que ha hecho de la *mera* importación en Puerto Rico un evento localmente tributable, sino el propio Congreso de Estados Unidos, en uso de su poder ilimitado de legislar para los territorios."

La autoridad concedida por el Congreso mediante la enmienda Butler a El Pueblo de Puerto Rico para imponer una contribución local sobre artículos importados ya fueren de Estados Unidos o de países extranjeros tan pronto como fueren importados, (sujeta a la única condición de uniformidad), independientemente de las leyes y reglamentos aduaneros federales; independientemente de la doctrina del paquete original e independientemente de si su efecto práctico era el de un derecho de aduanas cuya recaudación no se realizaba por funcionarios aduaneros, quedó consagrada, como muy bien determinó el tribunal de instancia, por la decisión emitida por la Corte Suprema federal en *West India Oil Co.* v. *Domenech*, 311 U. S. 20 (1940).([6]) En este caso dicha corte

---

([6]) Esta cuestión fue expresa y consistentemente dejada sin resolver en *Pyramid Products* v. *Buscaglia*, 64 D.P.R. 828, 829, escolio 4; *Puerto Rico Ilustrado* v. *Buscaglia*, 64 D.P.R. 914; *Ballester Hnos.* v. *Tribunal de Contribuciones*, 66 D.P.R. 560, 584, escolio 21; *Gallardo* v. *Santini Fertilizer Co.*, 11 F.2d 587, 588, y *Buscaglia* v. *Liggett & Myers Tobacco Co.*,

fue más allá del problema envuelto a base de la contribución que lo motivó, para enfocar y definir globalmente el poder fiscal de Puerto Rico a la luz de la Carta Orgánica, de otros estatutos y de la Constitución.

Después de transcribirse en la opinión de ese caso la parte pertinente del "disponiéndose" que adicionó la enmienda Butler al Artículo 3 de la Carta Orgánica de 1917, a las páginas 27 y 28, se pronunció así la Corte Suprema:

"El evidente propósito de las palabras de este 'disponiéndose' es que cualquier contribución (*any tax*) autorizada por la Carta Orgánica *sobre artículos de producción doméstica* podían imponerse igualmente respecto a artículos importados 'tan pronto como los mismos hayan sido manufacturados, vendidos, usados o importados en la Isla' bajo la única condición de que no se haría discriminación contributiva entre los artículos introducidos desde Estados Unidos y países extranjeros y los artículos domésticos. La enmienda parece que fue ocasionada por las dudas surgidas sobre si la mercancía traída a la Isla desde Estados Unidos estaba sujeta a contribución local mientras estuviera en su envoltura original, y también sobre si la mercancía tenía mientras se encontrara bajo el dominio de las autoridades aduaneras, el mismo *status* respecto a la tributación local como las mercancías procedentes de países extranjeros bajo el mismo dominio aduanero y sobre si el poder de la legislatura insular para tributar artículos importados desde países extranjeros era algo mayor que el que se les prohibía a los estados por la Cláusula 2, de la Sección 10 del Art. 1 de la Constitución, para tributar géneros importados o exportados sin el consentimiento del Congreso. S. Rep. No. 1011, 69th Cong., Ist. Sess., pág. 2, Cf. *Sonneborn Bros.* v. *Cureton,* 262 U. S. 506, con *Baldwin* v. *Seelig,* 294 U. S. 511, 526. Estas cuestiones estuvieron envueltas en Puerto Rico Tax Appeals, 16 F.2d 545, decidido el 27 de enero de 1927, poco antes de la enmienda al artículo 3 de la Ley Or-

149 F.2d 493, 494, escolio 1. Esto motivó que la constitucionalidad de una autoridad impositiva tan específica y claramente delegada por el Congreso se mantuviera aquí en entredicho por largo tiempo, no obstante el continuo uso que de la misma ha hecho nuestra legislatura. Debemos indicar que a la fecha de resolverse este caso ya nuestra Asamblea Legislativa había aprobado muchas enmiendas a la sección 16 de la Ley haciendo de la mera importación un hecho imponible. Cf. 13 L.P.R.A., secciones 1031–1063.

gánica. Las sentencias en ese caso fueron revocadas y los pleitos fueron desestimados por esta Corte por falta de jurisdicción, 24 de octubre, 1927 (275 U. S. 56), después de la enmienda a la Carta Orgánica del 4 de marzo de 1927, que privó a las cortes federales de jurisdicción en los casos pendientes y en otros análogos para impedir la imposición y cobro de las contribuciones de Puerto Rico.

Además, dificultades prácticas se experimentaron en la imposición de impuestos insulares sobre artículos a su llegada desde los Estados Unidos y mientras se encontraban bajo la custodia de funcionarios postales o aduaneros, debido al hecho de que el impuesto local *que en sus efectos prácticos es un derecho de aduanas* no era recaudado por funcionarios postales o aduaneros—S. Rept. No. 1011, 69th Cong. 1st Sess. *Las dudas y dificultades fueron removidas por la enmienda al artículo 3, otorgándose el consentimiento congresional para que las mercaderías estuvieran sujetas a la jurisdicción contributiva de la legislatura de Puerto Rico tan pronto como fueran introducidas en la Isla tanto desde los Estados Unidos como desde países extranjeros,* y disponiéndose que los funcionarios aduaneros de Estados Unidos y su servicio postal ayudaría a los funcionarios locales en la recaudación de los impuestos. *El efecto del amplio lenguaje de la enmienda fue no sólo para sujetar a tributación todas las mercaderías importadas, bien desde los Estados Unidos como desde países extranjeros, sino para neutralizar el efecto normativo de las leyes de aduanas y sus reglamentos hasta donde los mismos protegían los artículos de la tributación local desde su llegada. La mercancía en su envoltura original fue así sometida a tributación al introducirse en la Isla sin consideración alguna a la reglamentación aduanera. Y era también evidente que cualquier otra mercancía que no estuviera en su envoltura original fue dejada en condición no más favorable, y en presencia del amplio y claro lenguaje del estatuto no podemos decir que la una, más que la otra, está inmune de tributación local."* (Énfasis suplido.)

En el caso de *Pyramid Products* v. *Buscaglia, Tes.,* 64 D.P.R. 828, 835 (1945), entre otras cosas dijimos:

"La decisión emitida por la Corte Suprema de los Estados Unidos el 12 de noviembre de 1940 en el caso de *West India Oil Co.* v. *Domenech,* 311 U. S. 20, disipó la duda sobre la facultad

de la Asamblea Legislativa de Puerto Rico bajo la sección 3 de la Ley Orgánica—según fue enmendada por la Ley Butler en 1927—para imponer arbitrios a los artículos importados de los Estados Unidos o de países extranjeros tan pronto eran introducidos en Puerto Rico. En aquel caso no estaba envuelta la Ley Núm. 40 de 1931 que ahora nos ocupa. Se impugnaba allí la autoridad del Tesorero para exigir y cobrar la contribución de dos por ciento (Ley de Rentas Internas, artículo 62, según fue enmendado por la Ley Núm. 17 de 3 de junio de 1927, pág. 458) sobre el aceite de combustible que la allí demandante había importado en Puerto Rico y depositaba en tanques de adeudo (bonded tanks) bajo el control del Servicio de Aduanas, de los cuales era extraído bajo la supervisión de los agentes federales, para entregarlo a virtud de contratos de venta, a vapores que lo consumían como combustible en sus viajes en el comercio extranjero. Se resolvió por la Corte Suprema de los Estados Unidos que a virtud de la Enmienda Butler el Congreso autorizó a la Asamblea Legislativa de Puerto Rico a imponer arbitrios sobre artículos importados de los Estados Unidos o de países extranjeros tan pronto son introducidos en Puerto Rico, siempre que no se discrimine entre los artículos importados y los producidos en la Isla; que esa facultad se extendía no sólo a los artículos que se hallaban en el paquete original, si que también a los que no lo estuvieren, y por consiguiente la contribución de dos por ciento sobre la venta en las condiciones descritas era válida.

"⠀⠀⠀⠀.⠀⠀⠀.⠀⠀⠀.⠀⠀⠀.⠀⠀⠀.⠀⠀⠀.⠀⠀⠀.

"La norma (policy) de la Asamblea Legislativa en legislación contemporánea con, y anterior y posterior a, la Ley Núm. 40 de 1931, fue la de no gravar artículos introducidos de los Estados Unidos o del extranjero, a menos que dichos artículos fuesen introducidos para la venta o consumo en Puerto Rico. Esa práctica cesó, según admite el apelante, en febrero 1942, después de conocerse la decisión del Tribunal Supremo de los Estados Unidos en el caso de *West India Oil Co.* v. *Domenech,* supra, y cuando se hallaba en gestación la Ley Núm. 217 de 1942—por la cual se enmendó la Ley Núm. 40 de 1931—imponiendo tributo a la gasolina introducida de países extranjeros o de los Estados Unidos, *independientemente de que dicha gasolina fuese destinada al consumo en Puerto Rico.*" (Énfasis suplido.)

Siete años después de la decisión del citado caso de *West India Oil Co.*, la Corte de Apelaciones para el Primer Circuito, decidió el de *Buscaglia, Treasurer* v. *Ballester*, 162 F.2d 805 (1947), certiorari denegado 332 U. S. 816. La cuestión allí suscitada fue la de si cierta mercancía comprada por la apelante en Argentina, cuya propiedad para el 15 de enero, era de ella, y que había arribado a la bahía de San Juan en un barco argentino el 13 de enero de 1943, pero sobre la cual no se había dado por los funcionarios de aduanas el permiso para descargarla hasta el 18 o el 20 de enero, estaba sujeta a la ley general imponiendo contribuciones ad valorem sobre la propiedad tasada el 15 de enero de ese año y para el año fiscal 1943–1944, con arreglo al artículo 297 del Código Político que, en lo pertinente, disponía: "todos los bienes muebles existentes en o fuera de Puerto Rico, serán tasados e incluidos en el reparto de contribuciones a nombre de su dueño respectivo . . . el día quince de enero . . . ."

El recurso fue interpuesto contra nuestra decisión en *Ballester Hnos.* v. *Tribunal de Contribuciones*, 66 D.P.R. 560 (1946), donde, (a pesar de lo que habíamos resuelto el 20 de febrero de 1946, o sea unos cuatro meses antes, en *Island Needlework* v. *Tribunal de Contribuciones*, 65 D.P.R. 727, 730, 732, y de la decisión en *General Oil Co.* v. *Crain*, 209 U. S. 211 y *Northwest Airlines* v. *Minnesota*, 322 U. S. 292, Anotación, 153 A.L.R. 264, 270) resolvimos que "una contribución local sobre una importación está de igual manera prohibida cuando la mercancía está todavía a bordo de la embarcación bajo la custodia de las autoridades de aduana quienes todavía no han expedido el permiso de entrega al importador." Revocamos la resolución del Tribunal de Contribuciones y devolvimos el caso con instrucciones de que se dictara resolución a favor de la contribuyente. Forjamos una interpretación demasiado restrictiva y limitativa de la letra, del espíritu y de los efectos de la enmienda Butler y de la abarcadora opinión emitida por la Corte Suprema de los Estados Unidos en el caso de la *West India Oil Co.* Por ella

eliminamos el R.I.P. que tanto la enmienda del 1927 como la decisión habían colocado sobre la tumba de la doctrina del paquete original e intentamos su triste resurrección, por lo menos, para enfrentarla a la recaudación de la contribución sobre propiedad mueble importada al momento de su llegada a nuestros puertos, aunque declarándola muy bien difunta en su aplicación a la imposición y cobro de los impuestos sobre rentas internas tan pronto como el artículo gravado entrase aquí.

La Corte de Circuito de Apelaciones revocó nuestro fallo y ante planteamientos similares a los que ahora nos hace la peticionaria The Texas Co. (P. R.) Inc. sobre los poderes fiscales de Puerto Rico respecto a bienes o géneros en poder de las autoridades aduaneras, entre otros, hizo los siguientes pronunciamientos, a las páginas 806–809 del citado tomo 162 F.2d:

"En la fecha de la tasación de esta contribución la mercancía había arribado físicamente dentro de la jurisdicción territorial de Puerto Rico, y aunque entonces no descargada o capaz de ser descargada, conforme a los hechos estipulados estaba destinada a convertirse, como de hecho después se convirtió, en una parte de la masa permanente de propiedad en el territorio. En la fecha crítica había por lo tanto adquirido un situs contributivo en Puerto Rico y en su consecuencia la cláusula del debido proceso de la sección 2 de la Carta Orgánica, 39 Stat. 951, 48 U. S. C. A. sección 737 no impedía la imposición de la contribución en discusión. *Gromer* v. *Standard Dredging Co.*, 224 U. S. 362, 32 S. Ct. 499, 56 L. Ed. 801.

"Tampoco ni la cláusula del comercio, Art. I, Sección 8, Cl. 3, ni la cláusula prohibiendo la imposición de tributos o impuestos sobre importaciones, Art. I, Sec. 10, Cl. 2 de la Constitución federal tendían alguna barrera a la imposición de la contribución disputada.

"La cláusula comercial concede al Congreso un poder plenario para regular nuestro comercio extranjero e interestatal y, por lo tanto, como una consecuencia necesaria tiene el efecto secundario de una restricción sobre el poder de los estados respecto a esta materia. Tiene dos aspectos, pero en ninguno de

ellos, tanto en el de una concesión de poder federal o como una necesaria y consecuente limitación sobre el poder de los estados, la misma afecta a Puerto Rico. En su aspecto de una delegación de poder al gobierno federal nada añade al comprensivo poder dado al Congreso por la Constitución, Art. IV, Sección 3, Cl. 2, para legislar respecto al territorio nacional, y no puede tener el consecuente efecto de limitar la acción territorial puesto que el Congreso ya tenía el poder bajo el Art. IV, Sección 3, Cl. 2, supra, para limitar tal acción hasta el punto que eligiese, aun hasta el de anular legislación local. Véase Sección 34 de la Carta Orgánica. 39 Stat. 951, 961, 48 U. S. C. A. secs. 822 y siguientes.

"La prohibición constitucional sobre la imposición de derechos o impuestos a las importaciones es inaplicable porque esa prohibición se impone sobre los estados, y Puerto Rico, como nosotros frecuentemente hemos tenido la ocasión de decir, no es un estado sino un territorio organizado no incorporado a Estados Unidos. *N. L. R. B.* v. *Padín Company, Inc.*, 1 Cir. 161 F.2d 353, y casos citados.

" . . . . . . .

"Pero las palabras 'contribuciones de rentas internas' no describen una estrecha categoría de contribuciones. Son usadas para describir cualquier contribución que un gobierno puede imponer con excepción de derechos aduaneros. Es como decir que son usadas para describir todas las contribuciones en general derivadas de fuentes internas en contraste con contribuciones derivadas de fuentes externas. Si la frase 'contribuciones de rentas internas' fue usada en la Ley Butler para definir alguna otra más estrechamente limitada categoría de contribuciones que ésta, estaríamos perdidos en la búsqueda de cuáles contribuciones se intentaron incluir en esa categoría limitada. Y pensamos que la Corte Suprema ha tenido que interpretar la frase como cubriendo todas las contribuciones de fuentes internas, y por lo tanto todas las contribuciones enumeradas en la primera oración de la sección 3 de la Ley Jones, cuando en West India Oil Co. v. Domenech, 311 U. S. 20, 27, 28, 61 S. Ct. 90, 92, 85 L. Ed. 16, dijo que el 'evidente propósito del *disponiéndose* añadido por la sección 1 de la Ley Butler es que *cualquier* contribución autorizada por el Acta Orgánica respecto a artículos de producción doméstica podían igualmente imponerse respecto

a artículos importados tan pronto como sean manufacturados, vendidos, usados, o importados en la Isla . . .'

" . . . . . .

"De este lenguaje concluimos que *aun cuando la particular aplicación de la contribución general insular sobre la propiedad a la mercancía de la apelada podía convertir esa contribución en sus efectos en un derecho o impuesto sobre las importaciones, todavía, a pesar de eso, es una contribución que el Congreso en el ejercicio de su poder plenario sobre la materia autorizó a la legislatura insular a imponer.*" (Énfasis suplido.)

La doctrina de esta decisión federal fue aplicada o citada con aprobación en *Soltero* v. *Descartes*, 192 F.2d 755, 759 (1951) ; *Estate of Albert*, 11 T. C. 742 (1948) ; *Mora* v. *Mejías*, 206 F.2d 377, 387 (1953) ; *Mora* v. *Torres*, 113 F. Supp. 309, 319 (1953) ; *Carrión* v. *González*, 125 F. Supp. 819, 823 (1954) ; *Guerrido* v. *Alcoa Steamship Co.*, 234 F.2d 349, 356 (1956).

Como expresó el interventor en su alegato—pág. 9—la cuestión es una de *lex scripta*. Puerto Rico recibió en términos claros, amplios y precisos, con la sola condición de guardar uniformidad en su ejercicio, del Congreso de Estados Unidos, la autoridad fiscal necesaria para imponer y recaudar, respecto a mercancías importadas y tan pronto como fueran introducidas en Puerto Rico, los mismos impuestos de rentas internas que impondría y recaudaría sobre artículos localmente manufacturados. Basta con el mero hecho de su introducción dentro de nuestra jurisdicción contributiva . o que ésta sea su punto de descanso o destino para que se pueda imponer y recaudar el impuesto sin tomar en consideración su disposición ulterior que dentro del país pueda hacer su importador, tal como su venta, uso o consumo. ([7]) Es uno de los que alternativa e independientemente forman el cuadro de los hechos imponibles o eventos contributivos.

---

([7]) Como cuestión de hecho, los arbitrios fueron pagados por la importadora "voluntariamente y sin que mediara requerimiento" veintidós días después de la llegada del aceite y de trasladarse, en parte, a sus tanques de almacenamiento.

Con espíritu platónico nadie se dedica habitual o accidentalmente a comprar afuera mercancías, géneros, productos o artículos importables, sujetos al pago de impuestos, sufragando sus gastos de transportación aérea o marítima hasta Puerto Rico. Con algún destino, propósito o designio de utilidad los trae aquí el importador vendedor o el importador usuario o consumidor. Comprendiendo a los primeros nuestro estatuto emplea los términos "venta" o "traspaso", y respecto a los segundos "uso" y "consumo". Su sección 7 dispone que "las palabras 'uso' y 'consumo' . . . se interpretarán en su más corriente significación."

Ese fin de utilidad está presente en el trasfondo o motivación de toda importación y enfocado así el problema, desde el punto de vista del importador no deja de tener algún principio de razón la contención de la peticionaria de que no puede haber importación independiente de la disposición ulterior del artículo importado. Pero el vía crucis en la recaudación de los impuestos de rentas internas sobre mercancías importadas que tuvieron que recorrer nuestros funcionarios fiscales desde el 1902 hasta el 4 de marzo de 1927 demostró lo inútil o académico que en su aspecto práctico y funcional resultaba el poder contributivo concedido inicialmente a Puerto Rico por el Congreso. La conjunción de los factores, adquisición del artículo en el exterior, su importación al país y su ulterior disposición local, creaban el nudo gordiano del problema. Y se desató el nudo en el 1927 separando el Congreso a los fines de la imposición y recaudación, la introducción o importación de toda ulterior y posible disposición local del artículo importado, disponiéndose que el impuesto podría imponerse y cobrarse "tan pronto como los mismos sean . . . introducidos en la Isla." Así constitucionalmente se creó como otro hecho imponible (taxable event) la mera introducción o importación con independencia de cualquier venta, disposición, uso o consumo de la mercancía importada.

Como dijimos en *P. R. Telephone Co.* v. *Tribunal de Contribuciones*, 68 D.P.R. 154, 163 (1948):

"Aquéllos que compran artículos en otro sitio y los usan en Puerto Rico disfrutan de nuestros recursos naturales, del trabajo de nuestro pueblo y de los servicios y protección de nuestro gobierno. Tal mercancía debe pagar su parte proporcional de las contribuciones. Un arbitrio de uso junto a un arbitrio de venta distribuye el peso de este método de levantar ingresos uniformemente entre artículos vendidos en Puerto Rico y artículos comprados en otro sitio para usarse aquí. Además, no hay razón constitucional que obligue a la Legislatura a poner a los vendedores locales en una desventaja en la competencia con los vendedores de fuera del estado."

No podemos aprobar la equivocada caracterización que le atribuye la peticionaria a la autoridad contributiva delegada a través de la enmienda Butler. Tendríamos que reestructurar, sin facultad alguna para ello, por algún fenómeno interpretativo, a la medida en que se le ocurre a ella, una pieza legislativa, de nivel constitucional, aprobada por el Congreso hace cerca de 34 años y destinada a que El Pueblo de Puerto Rico, sin trabas ni dificultades de índole legal, pueda proveerse de todos los ingresos necesarios a su mejor desarrollo y desenvolvimiento, y redefinir el sentido y alcance de interpretaciones judiciales de tribunales que revisan nuestros fallos.

Ninguna de las sobrevivientes disposiciones del Acta Foraker, ni la forma legislativa usada por el Congreso cuando permitió a Puerto Rico imponerle un derecho de aduana al café (19 U. S. C. secs. 1319, 1319a) nos obligan a concederle la razón a la peticionaria. Las primeras—véanse secciones 2 del Acta Foraker y 58 del Acta Jones—no impedían al Congreso concedernos los poderes fiscales que nos extendió la enmienda Butler; la segunda no representa nada más que una variante de la forma congresional de conceder facultades legislativas delegables a los territorios y aun a los estados. (⁸)

---

(⁸) Cf. *International Shoe Co.* v. *Washington*, 326 U. S. 310, 315 (1945); *California* v. *Zook*, 336 U. S. 725, 728 (1946); *United States* v. *Green*, 137 Fed. 179 (1905); *Union Bridge Co.* v. *United States*, 204 U. S. 364 (1907); *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761, 769 (1945); *Spector Motor Service* v. *O'Connor*, 340 U. S. 602, 608 (1951); *Prudential*

Por esas razones concluimos que el tribunal a quo no incidió en los tres primeros errores imputados ni en alguno de ellos.

## II

■■ Para sostener el cuarto señalamiento de error la peticionaria argumenta que, asumiendo la existencia de una facultad contributiva que permita la imposición y recaudación de impuestos de rentas internas sobre géneros importados por el mero hecho de su introducción en Puerto Rico, ella no estaba obligada al pago del impuesto sobre el keroseno porque el mismo se perdió durante el proceso de su entrega y sin que llegara a tierra y, por lo tanto, que nunca se importó, trajo o introdujo aquí.[9]

A los fines de la recaudación contributiva toda importación consiste de la llegada de la embarcación dentro de los límites de un puerto de entrada con la intención de entrar la mercancía extranjera destinada al mismo.[10] El lenguaje de la enmienda Butler explícitamente se refiere tanto a la mercancía que llega aquí desde los Estados Unidos como a la que llega desde países extranjeros. Aun cuando nuestra ley de rentas internas usa indistintamente los términos "introducir" e "importar" para denominar una sola actividad, existe una diferencia entre ambos en su uso corriente. La introducción tiene una significación de mayor alcance que la importación. Aquélla puede ser el género y ésta la especie.

No tenemos la más ligera sombra de duda de que el kero-

*Insurance Co.* v. *Benjamin*, 328 U. S. 408 (1946); Biklé, *The Silence of Congress*, 41 Harv. L. Rev. 200 (1927); Braden, *Umpire to the Federal System*, 10 U. Chi. L. Rev. (1942); Dowling, *Interstate Commerce and State Power-Revised Version*, 47 Colum. L. Rev. 547, 552 n. 19 (1947).

[9] La peticionaria nos ha dejado la firme impresión de haber seguido la misma línea de pensamientos de nuestra decisión de *Ballester Hnos.*, ante, para sostener su tesis contributiva, lo que nos produjo la sutil sensación de encontrarnos ante una especie de reconsideración *post mortem* de esa decisión.

[10] *Mata* v. *United States*, 19 F.2d 484 (1927); *The Squanto*, 13 F.2d 548 (1926). Cf. *Oregon Liquor Control Commission* v. *Anderson Food Markets*, 160 Or. 646, 87 P.2d 206; *Miranda* v. *People of Puerto Rico*, 101 F.2d 26, 29; *American Sugar Refining Co.* v. *Bidwell*, 124 F. 677, 681.

seno envuelto fue introducido, importado o traído a Puerto Rico como su punto final de destino, y colocado dentro de su jurisdicción contributiva, el día 18 de enero de 1948.

El "Fort Lane" partió desde Aruba con un cargamento de 715,943 galones de keroseno destinados a tres entidades traficantes en productos de petróleo en Puerto Rico, entre ellas la Texas Co. (P. R.) Inc., para ser entregado en los puertos de San Juan, Mayagüez y Ponce. En la medianoche del 17 al 18 de enero de 1948 hizo su entrada a la bahía de San Juan y atracó al muelle número 13. De la cantidad total se le hizo una rebaja estimada en 6,343 galones por concepto de merma natural y ordinaria supuesta a sufrirse en el transcurso de los viajes marítimos de esta clase de productos. Primeramente se comenzó a entregar a The Texas Co. (P. R.) Inc. la porción del cargamento correspondiente a ella. El trasiego del keroseno desde el barco hasta los tanques de su propiedad, utilizándose aparatos también pertenecientes a ella, principió a la una y cuarenta minutos de esa noche, bajo la inmediata inspección y vigilancia principal de su empleado Richard B. Polk. A las tres y diez minutos se realizaba la operación en forma normal y a esa hora se habían descargado 1,000 barriles de keroseno a los tanques de la peticionaria. A esa hora (3:30 A. M.) se retiró Polk al muelle número 14. A las 4:45 un capataz de muelle, empleado también de la peticionaria y que bregaba con el equipo de descarga fue a buscar a Polk al muelle número 14. Cuando Polk regresó al muelle número 13 encontró que la válvula para descargar el keroseno estaba parcialmente abierta y que no estaba puesta sobre esa válvula una pieza llamada "blind flange" y que se usaba como medida de seguridad adicional en las descargas. Ya el barco no estaba descargando. Más tarde Polk inspeccionó las aguas de la bahía y encontró una fina capa de petróleo flotando sobre las mismas.

Se estipuló por las partes que el keroseno derramado al mar alcanzó a 183,136 galones y que la pérdida de ellos "se

debió a negligencia del 'dock foreman', empleado de la querellante, quien, teniendo la responsabilidad de velar por el buen funcionamiento de las líneas o tuberías de recibo de la querellante, dejó parcialmente abierta la válvula de recibo de keroseno de la querellante ubicada en el muelle número 13 y quien dejó además sin colocar sobre dicha válvula la pieza circular de acero (blind flange) que cubre la misma como medida adicional de seguridad."

El "Fort Lane" hizo entrega de la restante parte de su cargamento en el puerto de Mayagüez el 19 de enero y al día siguiente en el de Ponce a las otras importadoras.

A base de estos hechos, que en parte fueron estipulados y en parte resultan probados por la evidencia documental unida a los autos, nadie puede sostener con buen éxito la afirmación de que el keroseno en cuestión no se importó, introdujo o trajo a Puerto Rico y que jamás se encontró dentro de nuestra jurisdicción contributiva.

Desde el año 1912 quedó resuelto que Puerto Rico tiene el poder de imponer una contribución a la propiedad radicada en la bahía de San Juan.[11] Se ha resuelto también que nuestra ley sobre compensaciones por accidentes del trabajo tiene aplicación sobre la zona marítima de Puerto Rico.[12] Ya hemos visto cómo la Corte de Circuito de Apelaciones en el caso de *Ballester Hnos*. decidió que bienes muebles traídos a Puerto Rico desde Argentina y que se encontraban en el barco pendientes de descarga y bajo custodia aduanera, tenían aquí su situs contributivo y estaban dentro de la jurisdicción contributiva del país.

---

[11] *Gromer* v. *Standard Dredging Co.*, 224 U. S. 362, 372.

[12] *Guerrido* v. *Alcoa Steamship Co.*, 234 F.2d 349, 356 (1956); *United P. R. Sugar Co.* v. *Corte*, 44 D.P.R. 930, 932 (1933).

En lo pertinente, disponen los artículos 7 y 8 del Acta Jones:

"...toda propiedad que al tiempo de la cesión pertenecía, en virtud de las leyes de España entonces en vigor, a las diferentes juntas de obras de puertos de Puerto Rico; todas las orillas de los puertos, muelles, embarcaderos, terrenos saneados, y todos los terrenos y edificios públicos no reservados hasta ahora, por los Estados Unidos para fines públicos, *quedan por la presente bajo el dominio del Gobierno de Puerto Rico, para ser*

Las circunstancias que produjeron la pérdida del keroseno no crearon inmunidad contributiva alguna a favor de la peticionaria. Desde el momento en que atracó el "Fort Lane" al muelle número 13, con el cargamento de keroseno, producto sujeto al impuesto de rentas internas, para ser descargado a los tanques de ella, se completó la importación o introducción en Puerto Rico y desde ese momento surgió la obligación contributiva dispuesta por el inciso 29 de la sección 16 de nuestra Ley de Rentas Internas. La operación de su total o parcial descarga bajo las disposiciones de la enmienda Butler y de nuestros estatutos contributivos, no es condición precedente para el nacimiento de esa obligación tal como se decidió en el tantas veces citado caso de *Ballester Hnos.* por la Corte de Circuito de Apelaciones.

Por otra parte, al ocurrir la pérdida ocasionada por actos negligentes de la propia peticionaria, realizados a través de sus empleados, como cuestión de hecho ya había pasado la etapa del control y custodia aduaneros ([13]) y estaba siendo bombeado, bajo la inspección y dirección de sus empleados, desde el barco a sus tanques.—Polk declaró que la cantidad total del keroseno efectivamente descargada a los tanques ascendió a 92,469.59 galones que representa un 33% de la porción total del cargamento destinada a la peticionaria.—

Tampoco se cometió el cuarto error señalado por la peticionaria.

administrados a beneficio del pueblo de Puerto Rico; y la Asamblea Legislativa de Puerto Rico tendrá autoridad, con sujeción a las limitaciones impuestas a todas sus leyes, para legislar respecto a todos esos asuntos según lo estimare conveniente; ...

"Artículo 8.—La superficie de los puertos y los cursos y extensiones de aguas navegables y los terrenos sumergidos bajo ellos dentro y alrededor de la isla de Puerto Rico y de las islas y aguas adyacentes, que ahora pertenecen a los Estados Unidos y no han sido reservados por los Estados Unidos para fines públicos, quedan por la presente colocados bajo el dominio del Gobierno de Puerto Rico, para que sean administrados de la misma manera y con sujeción a las mismas limitaciones que las propiedades enumeradas en el artículo precedente; ..."

([13]) Véase *Ballester Hnos.* v. *Tribunal de Contribuciones,* 66 D.P.R. 560, 589, sobre las distintas etapas reglamentarias del proceso aduanero.

## III

■■ Por el quinto señalamiento sostiene la peticionaria que el tribunal de instancia erró al denegar el reintegro bajo las disposiciones de la sección 16C de la Ley de Rentas Internas, tal como fue enmendada por la Ley Núm. 426 de 14 de mayo de 1947.

Al surgir la responsabilidad contributiva aquí envuelta el texto de esa Sección 16-C era, en lo pertinente, como sigue:

"Sección 16.C—No estarán sujetos al pago de los arbitrios impuestos por esta Ley, los siguientes objetos o efectos:

" (a) . . . . . . . .

" (b) *Aquéllos que a su recibo* estuvieren dañados, corrompidos o destruidos; ni los que se hubiesen evaporado o *perdido por rotura.* Disponiéndose, que en cualesquiera de los casos anteriores, la persona que alegue no venir obligada al pago de los arbitrios, deberá suministrar al Tesorero de Puerto Rico, dentro de los quince (15) días siguientes a la fecha de la introducción, prueba fehaciente e indubitada de su derecho a la exención; Disponiéndose, además, que de no hacerlo así dentro del término fijado, tal consignatario o introductor vendrá obligado a pagar sobre tales efectos u objetos los arbitrios especificados por esta Ley; . . ." (Énfasis suplido.)

La transcrita sección crea una exención contributiva. Lo mismo ocurre con la siguiente sección 16-B que declara exento del pago de los arbitrios, impuesto por la Ley de Rentas Internas, a todo aparato, maquinaria o equipo esencial para el establecimiento y funcionamiento de plantas industriales. Respecto a esta sección 16-B ya hemos resuelto que es una ley de exención y que debe interpretarse restrictivamente.[14] Idéntico pronunciamiento hacemos en cuanto a la sección 16-C. Siendo las exenciones contributivas derogaciones del poder del soberano, no deben extenderse más allá de los términos expresos y exactos del estatuto que las otorga y toda

---

[14] *Sucn. Serrallés* v. *Tribunal de Contribuciones,* 73 D.P.R. 35, 38 (1952); *Tesorero* v. *Tribunal de Contribuciones, Cervecería India, Int.,* 71 D.P.R. 512, 516 (1950).

duda debe resolverse en contra de la existencia de la exención.[15]

Como hacemos notar en el escolio 5, la peticionaria solicitó del entonces Tesorero de Puerto Rico el reintegro de los arbitrios porque entendía "que habiéndose perdido el artículo tributable antes de ser introducido . . ." tenía derecho a que le fueran reembolsados por tal concepto. La afirmación de haberse perdido el keroseno antes de ser introducido no estaba justificada por la realidad de lo ocurrido. El producto se introdujo, se puso a disposición de la peticionaria para su descarga y si no verificó esa descarga totalmente, ello se debió a su propia y evidente falta de diligencia, o, como ella misma estipuló:

". . . se debió a negligencia del 'dock-foreman', empleado de la querellante, quien, teniendo la responsabilidad de velar por el buen funcionamiento de las líneas o tuberías de recibo de la querellante, dejó parcialmente abierta la válvula de recibo de kerosene de la querellante ubicada en el muelle núm. 13 y quien dejó además sin colocar sobre dicha válvula la pieza circular de acero (blind flange) que cubre la misma como medida de seguridad."

De paso deseamos decir que la deposición de Polk revela que éste actuó con bastante falta de diligencia en relación con la descarga al ausentarse durante más de una hora del sitio en donde la misma se realizaba, contribuyendo también a que el producto importado se hiciera inutilizable.

El producto, a su recibo, ni en algún momento antes de su recibo, estaba dañado, corrompido o destruido; ni se había *perdido por rotura* aun después de su recibo. Dar lugar a que los 181,140 galones se derramaran sobre las aguas de la bahía porque el capataz de muelle, su empleado, dejara parcialmente abierta la válvula de recibo del keroseno y, además, porque dejara de colocar la pieza circular de acero que cubría la misma como medida de seguridad adicional y porque Polk,

[15] *Cía. Ferroviaria* v. *Secretario de Hacienda*, 80 D.P.R. 524, 534 (1958); *Francis* v. *Tribunal de Contribuciones y Tesorero*, 74 D.P.R. 19, 24 (1952).

su otro empleado, no actuó como un diligente asistente de operaciones, no equivale a la pérdida por rotura que en términos precisos el estatuto fija para concederse la exención del pago del impuesto. Ni la válvula de recibo, ni la pieza de seguridad adicional se rompieron, ni siquiera se dañaron. Mientras ambas se utilizaron en la forma correspondiente el trasiego a los tanques se efectuó, como lo dijo Polk, normalmente, y hasta el punto de haberse bombeado a los tanques 92,469.59 galones a temperatura natural. Ninguna rotura motivó que los restantes 181,140 galones dejaran de bombearse a esos mismos tanques.

Lo único que respecto a este punto nos dice en su alegato la peticionaria es lo siguiente: "Parece claro que la mercancía envuelta en este caso fue destruida o perdida." No nos dice nada más. Esas trece palabras no han surtido el efecto de convencernos de que bajo las circunstancias concurrentes ella sufrió la pérdida por rotura que contempla la exención contributiva que interesa, aun cuando consideremos las palabras usadas en el estatuto en su significado ordinario y práctico. No podemos reconocerle una amplitud o elasticidad a los términos precisos de la exención de tal dilación que equipare una pérdida por negligencia a una pérdida por rotura, (16) bajo las circunstancias específicas de este caso.

Por otro lado, la sección 16C impone como condición a cumplirse por el contribuyente la de que "deberá suministrar al Tesorero de Puerto Rico, dentro de los quince (15) días siguientes a la fecha de la introducción, prueba fehaciente e indubitada de su derecho a la exención." El término de quince días venció el 2 de febrero de 1948 sin que la peticionaria diera cumplimiento a la condición de la exención que alegaba tener.

---

(16) En *Cervecería India* v. *Tribunal de Contribuciones*, 70 D.P.R. 358 (1949) consideramos una cuestión sobre exención contributiva por haberse dañado por "causas naturales e inevitables sin haber mediado . . . culpa o negligencia." Toda vez que la exención allí envuelta se autorizaba por "pérdidas físicas que durante la rectificación . . . ocurren" y no a "pérdidas debidas a reacciones químicas . . . después de su manufactura", declaramos que no procedía concederse la exención.

No solicitó su prórroga. Fue a los 82 días de la introducción que le informó al Tesorero que estaba "dispuesta" a producir prueba fehaciente. Estima ella que dio cumplimiento cabal a la condición porque el 10 de mayo de 1950, o sea a los dos años y tres meses de la introducción, suscribió la segunda estipulación en el curso del procedimiento judicial que instó para lograr el reintegro y en la cual las partes hicieron constar que cierto agente de rentas internas estaba presente en el sitio de la ocurrencia de dicha pérdida "y de las causas que la motivaron." De concederle algún efecto probatorio a tal hecho estipulado, sería en el sentido de comprobar que no hubo pérdida alguna por rotura, sino pérdida por negligencia que fue precisamente lo que las partes hicieron constar en la primera estipulación.

El tribunal sentenciador considerando este punto bajo la hipótesis de que realmente hubiera ocurrido una pérdida por rotura, acertadamente dijo:

"Al examinar detenidamente la sección 16-C(b) nos damos cuenta que el requisito de ofrecer prueba fehaciente e indubitada al Tesorero dentro de los 15 días de la introducción o dentro de la prórroga concedida, es a los efectos de que el artículo quede *exento* del tributo, esto es, a los efectos de que el Tesorero resuelva como cuestión de hecho, que ese artículo en particular no paga. Y el no cumplimiento de tal requisito trae como consecuencia, de acuerdo con la propia sección, que el contribuyente deberá pagar la contribución. Se nos ocurre, no obstante, que una vez pagada la contribución el contribuyente podría hacer uso de otros estatutos que le conceden el derecho a pedir su devolución si es que la contribución es ilegal o nula, o se ha cobrado o pagado en exceso, o errónea e indebidamente, y acudir ante este Tribunal en caso de una negativa del Tesorero a devolver.

"Sin embargo, se nos ocurre también que cuando el estatuto específicamente impuso el requisito de que el contribuyente produjera prueba fehaciente e indubitada ante el Tesorero de su derecho a la exención por razón del producto dañado, corrompido o destruido, o evaporado o perdido por rotura dentro de un plazo relativamente breve, fue la intención del legislador el

que la cuestión *de hecho* en cuanto al daño, corrupción, destrucción, evaporación o pérdida por rotura al recibo del producto, se dilucidara ante el Tesorero a fin de que este funcionario hiciera su determinación administrativa *de hecho* sobre el particular cuando aun tuviera los medios de constatar la reclamación.

"De manera que en cuanto a las alegaciones contenidas en la demanda original que tocan la validez constitucional del arbitrio aquí envuelto, no abrigamos duda de que la demandante ha podido solicitar la devolución de la contribución pagada y ante la negativa, litigar la misma como lo ha hecho. Pero en tanto en cuanto la demandante basa su reclamación en las alegaciones adicionales en su demanda enmendada al efecto de que el producto estaba exento de la contribución bajo las disposiciones de la sección 16-C(b) de la Ley de Rentas Internas, entendemos que la demandante debió haber agotado primero la vía administrativa y dado la oportunidad al Tesorero de resolver administrativamente si el producto estaba dañado, corrompido, destruido, evaporado o perdido por rotura a su recibo. En otras palabras, entendemos que no ha habido la necesaria resolución administrativa del Tesorero sobre este aspecto de la controversia que nos autorice a considerar y resolver la misma judicialmente en primera instancia."

*La sentencia recurrida será confirmada.*

El Juez Asociado Señor Santana Becerra no intervino.